Doyle, Respondent, vs. La Crosse City Railway Company, Appellant.

*January 13—January 30, 1912.*

*Street railways: Injury to lineman: Charged span wire: Negligence: Questions for jury: Electricity: Degree of care required.*

1. In an action for injuries sustained by a lineman in falling from a pole the evidence is *held* to sustain a finding by the jury that such fall was caused by an electric shock received from a span wire with which plaintiff accidentally came in contact.

2. But, it appearing that there was absolutely nothing to indicate any defect in the insulation of any charged wire at the place and time in question, that the appliances were of approved pattern and material, and that all appeared to be in perfect order, and there being no evidence that defendant had failed to exercise due care in inspecting the wires and insulators, it is *held* that there was no warrant for a finding by the jury that the

presence of a dangerous current of electricity in the span wire
was due to negligence on the part of defendant.

3. Greater care is required of persons handling so dangerous an
agency as electricity than is required of those who handle mere
ordinary substances, but the criterion of ordinary care is the
same: it is such care as the majority or great mass of mankind
exercise under the same or similar circumstances.

APPEAL from a judgment of the circuit court for La Crosse
county: E. C. HIGBEE, Circuit Judge. *Reversed.*

This is an action brought to recover for personal injuries
sustained by the plaintiff while in the employ of the defend-
ant, resulting from a fall from one of the defendant's poles,
which pole the plaintiff was preparing for the use of the de-
fendant for trolley purposes. The negligence claimed by
the plaintiff is that the defendant allowed a span wire, with
which the plaintiff accidentally came in contact, to become
charged with electricity, by reason of which the plaintiff re-
ceived a shock which precipitated him to the ground. The
defendant denied that the span wire was charged with elec-
tricity, and claimed that the plaintiff fell to the ground acci-
dentally or by reason of his own negligence.

The plaintiff at the time of the accident, September 16,
1909, was an experienced lineman who had been engaged in
electrical work in the construction of trolley lines and in
other capacities for about twelve years. He had been em-
ployed by the defendant about ten days prior to the time of
the accident. The defendant owned and operated a double-
track street railroad in the city of La Crosse, operated by an
electric current of 550 volts, supplied by overhead trolley.
The power house of the company was located immediately
across the street from the pole where the accident happened.
On the day of the accident the plaintiff was at work getting
cross-arms ready for new poles, at about 8 o'clock in the
morning, when the defendant's superintendent, Shaw, in-
structed him to put cross-arms on three or four poles on the
east side of Third street, immediately opposite the power

house.   The plaintiff started about this task with a helper
named Peterson.   They commenced work upon the pole
where the accident happened, which was nearly opposite the
power house.   This was a pole which had been recently put
in place, and there were no cross-arms upon it.   The only
wire attached to it was a guy wire, which extended easterly
to the ground.   It was attached to the pole about six inches
below the point where the lower cross-arm was subsequently
placed by plaintiff.   To the east of this new pole was an
older pole, which was still in use and supported the span wire
in question, which extended across the street at this point and
supported the trolley wires.   This span wire was made of seven
or eight strands of twisted galvanized iron, and passed the new
pole about four inches away from and to the south of it, and
about four inches below the point where the guy wire was at-
tached to the new pole.   From this span wire were suspended
three insulated hangers, to which three trolley wires were at-
tached.   Two of these trolley wires seem to have been the
wires over the tracks of the railway, and the other over the
track which led into the house.   The hangers or insulators
by which the trolley wires were attached to the span wire
were the Ohio Brass Company's hangers, and are supposed to
be thoroughly insulated, so that the electric current cannot
escape from the trolley wire to the span wire.   The plaintiff
was equipped with spurs and a safety belt, and mounted the
pole to a point where he could conveniently handle the cross-
arms, and put them in the gains which had been cut in the
pole for the purpose.   His assistant, Peterson, passed to him
the cross-arms, and the plaintiff put them in position.   While
the plaintiff was putting the cross-arms in position Peterson
stood very near him upon the top of the elevated wagon called
the "Jim wagon," which was used by the defendant in the
repairing and construction of its lines, and the platform of
which was about sixteen feet from the ground.   He had his
arm over the span wire in question.   After the plaintiff had

placed the cross-arms in position and bolted them, he proceeded to pull the metal braces, which were upon the cross-arm, down in order to screw them in position. Before this work was accomplished, one Sewojski, the defendant's assistant superintendent, came to the place, and got on to the Jim wagon and told the plaintiff to stop his work there and go to Onalaska and cut off some wires upon a certain pole there, and leave Peterson to finish up the job he was then engaged in. The plaintiff testifies that he then took off his safety belt, put his right hand upon the guy wire, and reached up his left hand to the south cross-arm in order to see whether it was plumb with the north cross-arm, and that while he was doing this his left hand came in contact with the span wire, which was just in front of his breast, and an electric current gripped him, and that is all that he remembers until he woke up in the hospital. The fact is undisputed that he fell from the pole. The helper, Peterson, denies that the plaintiff touched the span wire, and says that he fell as he was starting to get down, by reason of his spurs not taking hold of the pole. Plaintiff was very seriously injured.

The jury returned the following verdict:

"(1) Was the span wire in question charged with a dangerous current of electricity at the time that plaintiff was directed to work upon the pole from which he fell? A. Yes.

"(2) If you answer question No. 1 'Yes,' then was such condition of the span wire due to defective and insufficient insulation of one or more of the hangers supporting the trolley wire attached to such span wire? A. Yes.

"(3) If you answer question No. 2 'Yes,' then could the defendant in the exercise of ordinary care have discovered and repaired such condition before directing the plaintiff to go to work upon said pole? A. Yes.

"(4) If you answer question No. 2 'Yes,' then was such condition of the wire the proximate cause of plaintiff's injury? A. Yes.

"(5) Was the plaintiff wanting in the exercise of any ordinary care which contributed to his injury? A. No.

"(6) If the court shall finally determine that the plaintiff is entitled to recover, at what sum do you assess his damages? A. $12,000."

The court denied successive motions made by defendant for judgment notwithstanding the verdict, to change the answers to a number of the questions in the verdict and enter judgment thereon as so changed, and to set aside the verdict and for a new trial, and rendered judgment on the verdict for the plaintiff, from which judgment the defendant appeals.

For the appellant there was a brief by *Woodward & Lees* and *George H. Gordon,* and oral argument by *Mr. G. M. Woodward* and *Mr. Gordon.*

For the respondent there was a brief by *Morris & Hartwell,* and oral argument by *Thomas Morris* and *F. H. Hartwell.*

Winslow, C. J. The plaintiff's claim is that he took hold of the guy wire with his right hand in order to assist himself upward, and that as he raised his left hand to adjust the cross-arm the hand came in contact with the span wire immediately in front of him, and that he received a shock of 550 volts, which gripped him, contracted his muscles, and then released him and let him fall to the ground. It is urged that this story is incredible, but we have not been able to come to that conclusion. It is true it was flatly denied by the evidence of the plaintiff's helper, Peterson, and it is true that the jury would have been amply justified in concluding from the evidence that the plaintiff fell from the pole without any electric shock, but we are not convinced that the plaintiff's version is impossible.

Our difficulty has been to discover any justification for the finding that the defendant was guilty of negligence. Granting that there was in the span wire at the moment of the accident a 550-volt current of electricity which found its way to the ground through plaintiff's body when he touched the

span wire with his left hand while his right hand was grasp-ing the guy wire, still the defendant is not liable unless the presence of the electricity in the span wire was the result of its want of ordinary care.

The negligence found was that there was defective insula-tion of one or more of the hangers which the defendant ought to have discovered and repaired before the accident.

It is true that greater care is properly demanded of per-sons who are handling so dangerous an agency as electricity than of those who handle mere ordinary substances, yet the criterion of ordinary care is the same: it is such care as the majority or great mass of mankind exercise under the same or similar circumstances. *Nagle v. Hake,* 123 Wis. 256, 101 N. W. 409.

In the present case there is no evidence tending to show negligence by the defendant, unless it be the evidence tending to show the presence of electricity in the span wire. Even if that condition existed, however, it does not necessarily follow that the defendant was guilty of want of ordinary care. If it appeared without dispute that the span wire had been put up on the previous day by competent workmen, using ap-proved material and appliances, and that it was to all ap-pearances in perfect condition, we suppose none would claim that there would be any sufficient ground for a finding of neg-ligence. There are limits to human endeavor. Even if we exercise the greatest care in our power, accidents will some-times unaccountably happen. The risk of such accidents all must assume. In the present case it seems, as far as the evidence shows, that there was nothing in the construction or appearance of the wire or the hangers that would even sug-gest that the insulation had become defective. The hangers were of an approved pattern in common use. They were composed of a copper "ear" with a groove on the top surface into which the trolley wire fitted and was fastened. From this a bolt two or three inches in length, constructed of some

very tough, hard, nonconducting substance, extended upward into the iron ear which is attached to the span wire, and over this bolt, screwed on to the top of the ear, is a metal cap which keeps the insulated bolt in place. So long as the nonconducting bolt is intact and the cap is screwed on, even though it be not fully screwed in place, there is no possibility of the trolley wire or the ear in which it rests coming in contact with the span wire or the metal part of the hanger.

It appears that two of the hangers on the span wire in question had been in place two or three years, and one had been in place from five to seven years. There is no evidence that any of them had ever been loose or out of order in any way. They appeared to be all right on the morning in question. The plaintiff himself testifies that when he reached the top of the pole he looked around and saw that things were all right; the insulators and the trolley wire looked all right; he noticed the feed-wire running across the street above the trolley wires to the top of the old pole, and the insulator was all right there. He was but a few feet from all these fixtures. It seems to be established beyond peradventure in the case, therefore, that there was absolutely nothing to indicate any defect in the insulation of any charged wire at that place on the morning in question, and that, on the contrary, every appliance had the appearance of being in perfect order. As said before, it does not appear that any of the appliances at this place had ever been out of order or that the span wire had ever been known to be charged before.

This being the case, there can be but one possible ground of negligence claimed, namely, that the defendant had failed to exercise due care in inspecting the wires and insulators. If there were proof that such hangers became frequently out of repair and allowed the current to escape to the span wire, it might perhaps be claimed that there was evidence enough to go to the jury on the question whether the defendant was negligent in not making more frequent inspections. But

there is no such evidence. On the contrary, the plaintiff himself says that from his experience as a lineman he did not know that such insulators frequently became leaky or defective, and that he never saw one become defective so that it would leak. He admitted that he had been a trolley lineman for years.

Another lineman of long experience with trolley wires, named Gibbons, called as a witness by the plaintiff, testified that he had known of the cap of a hanger becoming loose by reason of the trolley passing under it day by day; that he had known such things to happen at several places; that he couldn't say how long such hangers had been on before they became loose,—it might be six months or a year, or at the end of ten years; that he could specify no time within which he had known a hanger to become loose, and that the loosening of the cap would not necessarily destroy the insulation; that it might last for several years in that condition, giving perfect insulation.

This is practically all of the testimony on the subject of the length of time which ordinarily elapses before the loosening of a hanger takes place from use, and it will be readily seen that there is absolutely no testimony that hangers frequently become loose or defective so as to permit the escape of electricity. In fact the only reasonable inference to be drawn is that it is generally, if not always, a matter of years. Now the testimony is undisputed that the company made a thorough test of the whole line twice a year, in spring and fall, going over and tightening up all the hangers, and that the whole line was gone over in the spring of 1909 to see that the insulation was perfect and nothing loose.

In view of the lack of any evidence tending to show that more frequent inspection was customary with other companies, or was called for by the fact that the hangers easily or frequently became defective from use, and the further undisputed fact that there was absolutely nothing to indicate

any defect in any of the hangers in question at the time of the accident, we do not think that the jury was entitled to find any want of ordinary care on the part of the defendant in the present case.

This view of the case obviates the necessity of the examination of any further questions.

*By the Court.*—Judgment reversed, and action remanded for a new trial.