Argued January 9, decided January 20, 1914.

# MYERS *v.* PORTLAND RY. LIGHT & POWER CO.

### (138 Pac. 213.)

**Master and Servant—Injuries to Servant—Actions—Questions for Jury.**

1. In an action for the death of an employee in an electric plant, evidence *held* to present a question for the jury whether the death was caused by an electric shock.

**Master and Servant—Injuries to Servant—Care Required of Master.**

2. A corporation operating an electric plant is presumed to know all of the conditions there that would be known to an electrician, or is negligent in not knowing, and is charged with the knowledge of its head electrician.

> [As to the knowledge of appliances, etc., master is chargeable with so as to render him liable to injured servant, see note in 4 Ann. Cas. 763.]

**Master and Servant—Injuries to Servant—Actions—Questions for Jury.**

3. In an action for the death of an employee in an electric plant, evidence *held* to present questions for the jury whether conditions were dangerous to the decedent, or whether defendant was negligent in permitting the conditions or allowing decedent to work there.

> [As to master's liability to servants for injuries due to defective machinery or materials, see notes in 77 Am. Dec. 218; 98 Am. St. Rep. 289.]

**Master and Servant—Injuries to Servant—Care Required of Master.**

4. The decree of care required of a master increases in proportion to the increased danger, and in the use of such a dangerous element as electricity the highest degree of care is required.

From Multnomah: ROBERT G. MORROW, Judge.

Department 2.   Statement by MR. JUSTICE EAKIN.

This is an action by W. W. Myers, administrator of the estate of Edward Swanson, deceased, against the Portland Ry. Light & Power Co. to recover damages for the death of Edward Swanson, alleged to have been caused by an electric shock received by him while in the employ of the defendant. Defendant was engaged in developing, storing and transmitting electric-

ity for commercial purposes, at Cazadero, Clackamas County, Oregon, and at the time of the death of Swanson was testing new machines, using three wooden tanks filled with water for that purpose, in each of which were hung three blades through which the current was conducted. Upon such blades and upon the water in which they were submerged salt was at intervals deposited for the purpose of increasing the resistance to the current. Swanson had been employed by the defendant mixing concrete, and had no knowledge of electricity or experience in handling the same, nor did he know the dangers of high voltages, of which fact defendant was aware. He was directed to deposit salt in the water at the blades as needed. Of the three blades hung in the tank one was near each end and one in the middle. The tanks were fifteen feet long, five feet high, and four or five feet wide. Twenty-three hundred volts of electricity were being conducted into the tank, which would cause the water to boil in the vicinity of the blades, and when so boiling would leak out over the top of and through the tank to the ground. It was decedent's duty to throw salt on each of these blades, and while so employed, on February 26, 1910, he was found dead, lying face downward near the end of the tank farthest from the power-house. On the trial, at the close of plaintiff's evidence, on motion of defendant, a judgment of nonsuit was granted, and plaintiff appeals.

REVERSED AND REMANDED.

For appellant there was a brief over the names of *Mr. Franklin Korell, Mr. Jerry E. Bronaugh* and *Mr. Gilbert Hedges,* with oral arguments by *Mr. Korell* and *Mr. Bronaugh.*

For respondent there was a brief over the name of *Messrs. Griffith, Leiter & Allen,* with an oral argument by *Mr. Harrison Allen.*

MR. JUSTICE EAKIN delivered the opinion of the court.

1. Electricity is a name given to the cause of a series of phenomena exhibited by various substances, and also to the phenomena themselves. Its true nature is not well understood: 15 Cyc. 467. It is said in *Spensley* v. *Lancashire Ins. Co.*, 54 Wis. 433, 442 (11 N. W. 894, 898): "We are totally ignorant of the nature of this cause [electricity]—whether * * a material agent or merely a property of matter. * * Electricity, when accumulated in large quantities, becomes an agent of producing the most sudden, violent and destructive effects." The Americana says the electric shock causes delirium of the heart muscles, which results in a stoppage of that organ, and death is instantaneous. Deiser on the Law of Conflicting Uses of Electricity and Electrolysis, Section 81, says: "The principle is becoming generally recognized that electricity must take its place with other agents recognized to be dangerous *per se*. From this results the proposition that the person who employs electricity for his own benefit is almost an insurer that no harm will come to other individuals through its use; * * that there is an underlying condition imposed for the protection of the public upon an undertaking of such a nature, which is not yet in its final stages of development, and may involve undiscovered dangers, which it would not be fair to throw upon the public": See *Midwood & Co. Ltd.* v. *Manchester Corporation,* L. R. 2 K. B. (1905) 602. Electricity is a highly subtle, imponderable fluid. It cannot be seen, and its presence or influence is only known by its effect; and much that we know about it may be called mere inferences, yet they are now so definite and actual that they are recognized facts. We do not doubt that a man is shot when he is seen to fall under certain con-

ditions and we see the wound, nor do we require proof
that someone saw the bullet leave the gun and pene-
trate the body. We simply infer it from the circum-
stances, though no one can say from the wound alone
that it was made by the bullet. We assume or infer
so from the surrounding circumstances, and yet we
base many other inferences upon that assumption.
In other words, we accept the first inference as a fact,
and so we must do in the case of electricity. We take
it as a fact that a man received an electric shock when
we see the effects of such a shock in the movements,
conditions and results. Although exceptions were
taken to many rulings of the court in relation to the
evidence of such conditions, they are not brought here
as errors, and we can consider only the motion for
nonsuit, and we think from the circumstances dis-
closed by the evidence as to conditions in the locality
of the prostrate body of decedent, the suddenness of
the death, and the marks on the body, that it was a
question to be submitted to the jury as to whether the
death was caused by an electric shock. The decedent
had not been out of the view of fellow-workmen to
exceed two minutes when his body was found. They
seemed to have been fearing such an occurrence.
Bower, defendant's expert electrician, testified that
if decedent had touched the tank while standing on
the ground he might have formed a circuit from the
top of the tank to the ground and received some slight
shock; that there were 2,300 volts of electricity being
put into the tank; that water is a conductor of elec-
tricity, and, when salt is applied, the water is a much
better conductor; that wet wood and damp ground
are also conductors of the current; that the water was
escaping from the tank and over the top of it, and
that the meters with which he was testing the load
on the wires would not indicate the escape of such a
current that would give one a shock; that the escape

of such a current would not cause much resistance; that it takes very little current to kill a man; that a current that would kill one man might not severely hurt another; that when found the body was lying face downward near the end of the tank farthest from the power-house, between the tank and the corrugated iron house; that the decedent had just gone there to put salt in the tank; that the blade on which he had to throw salt was two feet from the end of the tank. Bower received a shock in that vicinity. The same afternoon Pendergast also received one, evidently from the ground alone, at a point eight feet distant. He says he was afraid of the ground; that he was not there again after he got the shock, once being enough for him; that he had the current shut off before he would go to the body; that he was near the door of the corrugated iron house when he got the shock, between it and the tank; thinks he got too close to the tank. This was in the vicinity of where the body of decedent was found. A juror asked witness Larson, an expert electrician: "If the water in the tank boils over [from the effects of the electric current sent in to the blades in the tank] and runs down along the side of the tank, and makes a circuit with the ground, is it possible for a man to get a shock then?" The witness answered: "It is pretty hard to say, It depends on the circumstances. It is possible, but it is hardly probable."

2-4. There is no question involved here of the negligence of fellow-servants. No fellow-servant had anything to do with the circumstances leading up to the death. It is a question whether the place was safe, and whether decedent had been warned of the danger. The place where the body was found was at the exact point where he should have been in order to put salt on the blade farthest from the power-house. The defendant corporation is presumed to know of all the

conditions there that would be known to an electrician, or, if not, then it was negligent in not knowing. It is charged with what was within the knowledge of its head electrician. These conditions were the necessary result of the undertaking being carried on in the manner it was being done, and it was a question for the jury whether the conditions were dangerous to decedent, or whether defendant was negligent in permitting the conditions or in allowing decedent to work there. There is no suggestion in the evidence of contributory negligence. The degree of care required of an employer increases in proportion to the increased degree of the danger. In the use of such a dangerous element as electricity the highest degree of care is required: 15 Cyc. 472; 10 Am. & Eng. Ency. of Law (2 ed.), 873; *Macon* v. *Paducah St. R. Co.,* 110 Ky. 680 (62 S. W. 496), 23 Ky. Law Rep. 46; *Haynes* v. *Raleigh Gas Co.,* 114 N. C. 203 (19 S. E. 344, 41 Am. St. Rep. 786, 26 L. R. A. 810). In a note to *Hebert* v. *Lake Charles Ice etc. Co.* (111 La. 522, 35 South. 731, 64 L. R. A. 101), contained in 100 Am. St. Rep. 516, it is said: "The terms 'due care' and 'ordinary diligence,' as used in the law of negligence, are relative terms, and mean a degree of care commensurate with the danger involved. In the control and management of an exceedingly dangerous agency, such as electricity, the law exacts a corresponding degree of skill and diligence." In *Macon* v. *Paducah St. Ry. Co.,* 110 Ky. 680 (62 S. W. 496), it is said: "It has been repeatedly held by this court that persons using electricity either for lighting or for propelling cars, or other business, must exercise the highest degree of care for the protection of all persons in all places where such persons have a right to be. * * No person undertook to state as a matter of fact how the electricity reached the downhanging wire, nor do we deem it a matter of importance in this case. * * It is

certain that if the wire in question had not been hanging down, the injury would not have occurred.'' It may be that this is applying the rule of *res ipsa loquitur*. The rule does not necessarily presume negligence from the mere fact of injury, but rather that it may be inferred from the facts and circumstances disclosed in the absence of evidence showing that it occurred without the fault of the defendant. As said by Mr. Justice Wolverton in *Boyd* v. *Portland General Elec. Co.,* 41 Or. 336 (68 Pac. 810):

''The * * rule is therefore born of necessity, and entails the burden upon the defendant of showing due care when the facts are within his exclusive knowledge, so that the plaintiff cannot reasonably be expected to know or prove them. There must be something, however, in the facts proven in each case, that speaks of the negligence of the defendant; and the question to be propounded and solved in every such case is, Do the proofs speak through inference and presumption of the negligent conduct of the defendant?''

Mr. Chief Justice Bean, in the case of *Boyd* v. *Portland Electric Co.,* 40 Or. 126 (66 Pac. 576, 57 L. R. A. 619), says:

''But there are instances in which proof of an accident and the manner of its occurrence is sufficient to make a *prima facie* case, and to cast the burden on the defendant to show that it occurred without fault on his part. As a general rule, where the thing which causes the injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of events would not happen if he had used proper care, it affords reasonable evidence, in the absence of a satisfactory explanation that the accident arose from a want of care. * * This doctrine is held applicable in actions for injuries received from contact with a live electric wire in a public street.

Electricity is a dangerous element, and those who make merchandise of it are legally bound to exercise that degree of care that will render its use reasonably safe; and, as the wires which convey it cannot safely be permitted within reach of travelers, a presumption arises, when they are found out of their proper place, that those having them in charge have been negligent. * * The defendant contends, however, that as the complaint in hand avers that the wire which caused the injury was weak and defective, and insufficiently stretched and fastened, the plaintiff was obliged to point out by his testimony some defects in the particulars alleged. But we are unable to concur in this view. The doctrine of *'res ipsa loquitur'* alluded to is a mere rule of evidence. * * It proceeds on the theory, as the term implies, that the happening of an accident under certain circumstances is of itself *prima facie* evidence of negligence, and, when there is evidence of the particular negligence charged in the complaint, the plaintiff is entitled to invoke the rule.''

We conclude that it was error for the court to grant the judgment of nonsuit. The cause is reversed for further proceedings.    Reversed and Remanded.

Mr. Chief Justice McBride, Mr. Justice Bean and Mr. Justice McNary concur.