Argued June 7, affirmed June 29, 1915.

# YOVOVICH *v.* FALLS CITY LUMBER CO.

(149 Pac. 941.)

**Master and Servant—Employers' Liability Act—Scope.**

1.   The Employers' Liability Act (Laws 1911, page 16), Section 1, providing generally that all owners, contractors, subcontractors and other persons having charge of, or responsible for, any work involving a risk or danger to the employees or the public, shall use every device, care and precaution for the protection and safety of life and limb, includes hazardous occupations in general, not specifically enumerated in the first part of the section.

> [As to what is "accident arising out of and in cause of employment" within Employers' Liability Act, see note in Ann. Cas. 1914D, 1284.]

**Death—Employers' Liability Act—Recovery by Father.**

2.   Under Employers' Liability Act, Section 4, father of an employee killed in service, who left no widow, lineal heirs, adopted children, or mother, had right to maintain an action for the death.

**Master and Servant—Employers' Liability Act—Hazardous Occupation—Question for Jury.**

3.   Whether the work conducted by an employer, in which an employee is killed or injured, involved a risk or danger to such employee, is a question of fact for the jury.

**Master and Servant—Employment Within Employers' Liability Act—Lumbering—Question for Jury.**

4.   Whether deceased, killed by the springing up of a tree trunk which he had just cut through by direction of his foreman, was engaged in a hazardous employment, involving a risk and danger to the employee, within the Employers' Liability Act *held* for the jury, under the evidence.

**Master and Servant—Employers' Liability Act—Negligence of Fellow-servant.**

5.   By direct provision of Employers' Liability Act, Section 5, where the deceased servant, in cutting through a tree, merely conformed to the directions of his superior, as was his duty, for the resulting injury the employer was liable, irrespective of any negligence on the part of such superior servant.

**Master and Servant—Employers' Liability Act—Agent of Employer.**

6.   By direct provisions of Employers' Liability Act, Section 2, the foreman in charge of the lumbering operations, in which deceased servant was engaged at his death, was the agent of the lumber company.

**Death—Employers' Liability Act—Death of Servant—Damages of Parent.**

7.   For the death of a servant, his father, suing under the Employers' Liability Act, was entitled to the amount which he might

have expected to come to him as the deceased heir, if the latter should die, to be calculated in view of the average earnings of the deceased, the prospective years he had to live, his industry, frugality and saving qualities, irrespective of the age of the father.

**Death—Parent's Action for Death—Employers' Liability Act—Instruction.**

8. In a father's action under the Employers' Liability Act against the employer of his son, killed in service, a charge that the jury should not take into consideration; in estimating damages, the wounds to the parent's feelings, nor give compensation for the pain and suffering inflicted upon him, but should estimate the financial loss suffered by the death, sufficiently instructed the jury that the damages were limited to compensatory damages.

From Multnomah: THOMAS J. CLEETON, Judge.

Department 2.    Statement by MR. JUSTICE BEAN.

This is an action to recover damages for the wrongful death of Stanko Yovovich, plaintiff's son, who received an injury while employed by the Falls City Lumber Company. The cause was tried to the court and jury, and a verdict rendered in favor of plaintiff for $1,100. From a judgment entered thereon, the defendant appeals.

At the time of receiving the injury which produced his death, the decedent was employed by the defendant and working in its logging camp as a timber "bucker"; his duties being to saw fallen trees into logs. The evidence shows that the trees had been felled by timber fallers and marked by the "head bucker." As the work was usually conducted, the employees would fell the trees by sawing the same off about four feet above the surface of the ground, and the head bucker, who was foreman over the other employees, including the deceased, would then examine the trees felled and determine whether and how and where they should be sawed into sections, placing marks thereon, which constituted orders and directions to the buckers to saw the trees in two at such marks. The decedent had

nothing to do with felling the trees or placing the marks; his sole duty being to saw them where marked. It appears that a certain green and live hemlock tree was lying on the ground with a number of other trees which had been felled in the usual way. This particular tree, however, had not been cut-off at the butt by the timber fallers, which was unknown to the deceased, but known to the head bucker and timber fallers. It was either a windfall or had been knocked down by the falling of other trees against it. It was lying on the ground and bore the same appearance as the other trees which had been properly felled. Two other trees were lying across the top or upper part of this tree; their weight, until released, being sufficient to hold the hemlock in place on the ground. The foreman, without having the tree sawed off near the roots, as the others were, marked this tree for sawing in the same way as the other trees. One of these marks was placed at a point about 30 or 35 feet from the roots of the tree and below the two trees lying upon it. On May 17, 1913, decedent came to the tree in question, and in the course of his employment, according to his duty, proceeded to saw it in two at the mark placed thereon by the foreman below the other two trees. Just about as he had severed the tree and was working upon or about the same with his saw or ax, it flew back into an upright position, being released from the weight of its top and from the weight of the two trees upon it, and hurled the deceased through the air and upon the ground, injuring him so severely that he died as a result.

The action is brought under the Employers' Liability Act (General Laws of Oregon 1911, p. 16). It is alleged in the complaint that the work in which the

decedent was engaged, and which defendant was in charge of and responsible for, involved a risk and danger to the decedent and the other employees, and that the defendant failed to exercise that degree of care and precaution which the statute enjoins shall be used where work of such a hazardous nature is being prosecuted. The details of the negligence are set forth in the complaint as follows:

"That it was practical, without impairing the efficiency of the work or means of work then and there being pursued by the defendant, to have safeguarded, protected, and rendered safe the place where said Stanko Yovovich was so ordered to and did perform his duties by means of either one or all of the following devices, cares and precautions, to wit: (1) By properly falling the said live tree and by cutting the same at the butt, the same as the other trees in the vicinity were felled. (2) By sawing off said live tree close to the butt after the same was so pressed down by the other trees. (3) By inspecting the said live tree and ascertaining the fact that the same had not been felled, but was only pressed to the ground and liable to spring up when cut, and warning the buckers and Stanko Yovovich of that fact. (4) By refraining from placing a mark upon said live tree for the sawing of the same at any place. And this plaintiff alleges that the defendant did not use any of said devices, cares and precautions, but wholly failed and neglected to protect or safeguard said place where said Stanko Yovovich was required to work by any of said means, and that, had said defendant exercised such care and precautions, the death of Stanko Yovovich would not have occurred."

The plaintiff further alleged that in ordering decedent to cut the live tree and in failing to furnish him with a safe place to work, the defendant was negligent in the particulars above enumerated. By its answer

the defendant admits the employment of the decedent and denies the allegations of negligence. It further alleges that, at the time of the accident complained of, Yovovich was engaged in cutting trees into sections; that, while cutting off one of the sections after the same had been completely. severed, the stump of the remaining portion of the tree, being freed from the weight of the top, flew up, throwing the deceased, and causing the injury from which he died; that the tree upon which the decedent was working was what was known as a windfall, and that the decedent had been specially warned by defendant to look out for said tree and not get hurt; that Yovovich was guilty of negligence causing the accident in that he attempted to work about the tree contrary to the warnings, and unnecessarily stood thereon; that he assumed the risk.

Affirmed.

For appellant there was a brief over the names of *Messrs. Wilbur, Spencer & Beckett, Mr. F. C. Howell* and *Mr. A. L. Clark,* with an oral argument by *Mr. Howell.*

For respondent there was a brief by *Messrs. Malarkey, Seabrook & Dibble* and *Mr. George C. Johnson,* with oral arguments by *Mr. A. M. Dibble* and *Mr. Johnson.*

Mr. Justice Bean delivered the opinion of the court.

It is contended by counsel for defendant that the evidence does not bring the action within the Employers' Liability Act. At the close of the evidence, they moved for a directed verdict in favor of the defendant company.

Isaac Barton, the defendant's foreman, describes the condition of the tree thus:

"The tree had just tipped over, and the roots stood not straight up and down, because the ground was a little bit sloping; and there was another tree laid across here. Now, as to whether that was a windfall (but I think it was), I don't remember just the fact of whether that was a windfall or not, but I think the upper one was a windfall, and the top of this tree laid up on that, so that it laid kind of with the hill. It couldn't lay flat, and, of course, when that was sawed off, it just simply tipped back, and left the tree—the root didn't stand up straight after it was tipped back. It stood a little that way (illustrating), because it couldn't go clear back after tipping out, hardly, because there would more or less dirt, you know, rattle off. Well, that held it just a little bit. It is pretty near straight, but not quite.

"Q. And how high did you say these roots stuck up in the air?

"A. About 30 feet, I should judge; that is, to the point of them—not the dirt, but the point of the roots. I should judge they stuck up 30 feet, because it was a hemlock, and tore up an awful pile of dirt."

Barton further testified in part:

"Well, I got this thick wedge and drove it in so I could slip his ax out, and after I got his ax out he started to walk down the tree; and I says, 'Stanko, you see this tree has got a root on it here, and she is'—

"Q. (Interrupting.)   The tree has got what?

"A. A root on it; and I says, 'When it is sawed off, that is going to upset—fall back.' * * "

The testimony of Evan Yovovich, as interpreted, was in part as follows:

"A. He was right with him [decedent], only 20 feet distant from him—20 feet distant from where he was killed.   * * He says he saw his cousin there sawing

the timber, there, kind of like that. There was two together—

"The Court: Laying side by side?

"A. Yes; and he sawed one off, and he went on the other, and he sawed over on this side, and cut the other side, and at that time he turned around. He was working, and don't know. It was when he heard something crack; then he turned his eye to him, and says he saw him and the ax flying in the air."

It is urged by counsel for defendant that there is no evidence in the record showing that it was practicable to perform the work in a safer way than the means employed. Counsel candidly state in their brief that, had said fact been shown, the case might have been brought within the provisions of the Employers' Liability Act.

1–3. Section 1 of the act provides *inter alia* that generally all owners, contractors or subcontractors, and other persons having charge of or responsible for any work involving a risk or danger to the employees or the public, shall use every device, care and precaution which it is practicable to use for the protection of life and limb. The application of this general clause of the statute is not a new question, and it is perhaps proper to state that the matter has been thoroughly considered by the court at different times. In *Dunn v. Orchard Land & Timber Co.*, 68 Or. 97, at page 101 (136 Pac. 872, at page 873), this court had before it the construction of Section 1, and, speaking through Mr. Justice Burnett, said:

"The statute exerts its authority against 'all owners * * or persons whatsoever engaged * * in the erection or operation of any machinery.' It thus takes cognizance, not only of those who engage in building, but also those who operate machinery; and where it

declares that 'generally all owners, contractors or sub-contractors, and other persons having charge of, or responsible for, any work involving a risk or danger to the employees or the public,' it does not in good reason restrict the benefits and requirements of the law to particular persons mentioned in the beginning of the section, but rather enlarges and expands the scope of the act. The statute lays its commands, not only upon those engaged in building or in the transmission and use of electricity, but also upon those other persons included in larger category set out in the last clause of the first section."

It may also be stated that the general clause of the statute comprehends, within its provisions, acts of employers having charge of or responsible for work, involving a risk or danger to employees, usually termed hazardous occupations, which are not enumerated in the first part of the section: *Raiha* v. *Coos Bay Coal & Fuel Co.*, 77 Or. —— (149 Pac. 940) ; *Schulte* v. *Pacific Paper Co.*, 67 Or. 334 (135 Pac. 527, 136 Pac. 5) ; *Wasiljeff* v. *Hawley Pulp & Paper Co.*, 68 Or. 487 (137 Pac. 755) ; *Heiser* v. *Shasta Water Co.*, 71 Or. 566 (143 Pac. 917) ; *Lang* v. *Camden Iron Works*, 77 Or. —— (146 Pac. 964, 968). It appears that the decedent left no widow, lineal heirs, adopted children or mother; therefore, by Section 4 of the act, the father has the right to maintain the action: *McFarland* v. *Oregon Elec. R. Co.*, 70 Or. 27 (138 Pac. 458, 462). The question as to whether or not the work conducted by an employer involves a risk or danger to the employees is a proper one to be left to the jury as a question of fact: *Schaller* v. *Pacific Brick Co.*, 70 Or. 557 (139 Pac. 913, 915).

4–6. The main question is whether the evidence in this case brings it within the statute. The condition of the trees and the manner of conducting the work

were fully explained to the jury by the evidence, and it was for it to determine, under all the facts and circumstances, whether every practicable device and care was used by the defendant. To a jury exercising a common knowledge of the law of gravitation, and in the light of the experience of men of every-day affairs in regard to the work of cutting trees, the evidence tended to show that the defendant's foreman or head bucker neglected to use any device, care or precaution to keep the 30-foot stump in the position in which it was when the tree was marked and sawed, or to first cut the tree at the usual place near the roots. It is contended by counsel for defendant that the evidence does not show that the work could have been done in a safer way, and that, in order to bring the case within the scope of the statute, it was incumbent upon the plaintiff to produce such proof. This was plainly disclosed by the circumstances of the operations, if not by direct evidence. The deductions to be drawn from the facts and circumstances disclosed were a proper matter for the jury. It was not necessary for someone to act in the capacity of an expert and inform the jury what conclusion should have been drawn from the delineated facts and circumstances: *Myers* v. *Portland Ry., L. & P. Co.,* 68 Or. 599 (138 Pac. 213); *Pulsifer* v. *Berry,* 87 Me. 405 (32 Atl. 986). The evidence of Isaac Barton, foreman, that he warned the defendant to be careful and not get hurt, indicated that from his view there was special danger. The testimony in the case tended to show, and the jury could fairly have believed, that some precautions were necessary in marking the tree; that no experienced woodsman would have sawed the tree while in such

76 Or.—38

position, 30 or 35 feet from the roots, any more than an experienced axman would have cut a standing tree that distance from the ground, and that it was negligence of the architect of the work, the head bucker, to so direct the timber to be cut; that, according to common parlance, it was the preparation of a trap which would be sprung when the tree was cut and hurl the employee into the air, which by reasonable and practicable inspection and precaution could and should have been avoided; that the work was hazardous and involved a risk and danger to the employee. We hold that the case comes within the provisions of the statute, and that it was properly submitted to the jury. Witness Evan Yovovich stated that, when the tree was freed from the weight of the top, of course the roots and stump went back as nearly into place as the displaced earth would permit. Under Section 5 of the act, when the decedent conformed to the orders of his superior according to his duty, the resulting injury was not his fault. According to Section 2, the person in control of the work was the agent of the employer.

7, 8. Exceptions were taken to the instructions given to the jury upon the question of damages. The court instructed the jury in effect to take the average earnings of the deceased as a basis, with the prospective years that he would, in the course of nature, live, and determine from that how much he would save during that time which would go to his heir if he should die, informing them that it depends upon the industry, earning capacity, frugality, and saving qualities of the deceased; that it was not necessary for them to consider how old the father of the deceased was, but how much he lost by reason of the decedent's untimely death; that they should not take into consideration

the wounds to his feelings nor give compensation for
the pain and suffering that might have been inflicted
upon the relative, but estimate the financial loss suf-
fered by the death. Counsel for defendant requested
the court in effect to instruct the jury that the measure
of damages was limited to compensatory damages or
what damages would compensate plaintiff for his loss
of the deceased. We think that the requested instruc-
tion was substantially covered by the charge given by
the court, and that the instructions were in substance
in accordance with the ruling in *McFarland* v. *Oregon
Elec. R. Co.,* 70 Or. 27 (138 Pac. 458, 462), and *Mc-
Claugherty* v. *Rogue River Elec. Co.,* 73 Or. 135 (140
Pac. 64). From the amount of the verdict in the case,
it does not appear that the instructions of the court
as to the measure of damages were prejudicial to the
defendant.

Finding no error in the record, the judgment of the
lower court is affirmed.                    AFFIRMED.

MR. CHIEF JUSTICE MOORE, MR. JUSTICE EAKIN and
MR. JUSTICE HARRIS concur.