**CLINTON & O. W. R. CO. v. DUNLAP.**

No. 9198—Opinion Filed Oct. 1, 1918.

On Rehearing, June 10, 1919.

1. Master and Servant—Master's Duty—Safe Place and Appliances.

It is the duty of the employer to use ordinary care in furnishing his employe a safe place within which to work and safe tools and appliances with which to work. And the degree of care required is that which an ordinary prudent man would exercise under the same circumstances, and such degree of care must be commensurate with the dangers attending the employment.

2. Same—Action for Injuries to Employe—Sufficiency of Evidence.

The evidence in this case examined, and held sufficient to sustain the verdict.

(Syllabus by Pryor, C.)

Error from District Court, Custer County; W. C. Crow, Judge.

Action by Mrs. Harry Dunlap, in behalf of herself and her minor children, against the Clinton & Oklahoma Western Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed, on rehearing.

See, also, 56 Okla. 755, 156 Pac. 654.

Asp, Snyder, Owen & Lybrand, and Geo. T. Webster, for plaintiff in error.

A. J. Welch and J. M. Shackelford, for defendant in error.

Opinion by PRYOR, C. This action is brought by Mrs. Harry Dunlap, in behalf of herself and minor children, against the Clinton & Oklahoma Railway Company, to recover damages for the wrongful death of her husband, Harry Dunlap.

There was trial to the jury and judgment for the plaintiff in the sum of $7,500. From this judgment the defendant appealed.

The evidence and the inferences and deductions that may be reasonably made therefrom establish the following facts and circumstances:

That on the 31st day of July, 1913, Harry Dunlap was employed by the defendant as boiler maker and repairer in its shops in Clinton, Okla. On that date he was working on the flues of a boiler in said shops. In performing the work on the flues it was necessary for Dunlap to use an electric light, which was attached to an electric insulated extension cord furnished by the company. At about 5:45 in the evening Dunlap finished the work on the flues and came out of the boiler with the electric light and some other tools in his hand. It was an extremely hot day, and Dunlap and his clothing were wet with perspiration. The ground floor of the shop was covered with cinders and was also damp. Dunlap went to an iron tank or pump and made a gurgling noise, which attracted the attention of John Maney, the general manager of the railway company, and J. W. Austin, the company's master mechanic, both of whom were standing about 15 feet from Dunlap. On hearing the noise Maney and Austin quickly turned, and saw Dunlap leaning against the tank or pump with both hands drawn up to his breast, gripping the electric cord near the light in his left hand. Maney ran to Dunlap and jerked the cord out of his hand, while · Austin detached the cord from the post wherein it was attached some 15 or 20 feet away. Maney jerked the cord twice before he succeeded in getting it out of Dunlap's hands. When they reached Dunlap his body was in a stiffened and rigid condition. He did not fall, but was laid upon the ground by Maney, with the assistance of others in the shop. From all appearances he was dead when they laid him down. Maney further testified that he thought he received a slight shock from the extension cord while jerking the same from the hands of Dunlap.

In describing the accident the master mechanic testified as follows:

"In his right hand, and he just threw his right hand up like that (indicating) and the other one something like in that position, and looked around like he was looking at me and Mr. Maney—we were standing there—and made a kind of a struggling noise. I just thought he was getting a shock or something; we sometimes do get a shock from electric lights; it is a very common thing. I thought he was getting a shock, and I run over to this cord; it was about as far from here to one of those chairs (indicating chair) ; and I grabbed hold of the cord and pulled it loose from the connection there on the post. During this time, as I made that move to get the cord, Mr. Maney stepped to this man, Mr. Dunlap, and had hold of him when I walked to him Mr. Maney was there, and I took hold of him and told some of them to bring us some water. The man looked like he was dead to me; of course, we was kinda excited, that is the way it looked; and I hollowed for them to bring some water; I thought if I would bathe his face may be that would do him some good. * * * No, sir; there was a water pump and an iron pump in there for the purpose of storage tank for feeding this stationary boiler that he was working on, and this tank was something like as high as that table (indicating table), about that. He was leaning back against that."

Austin further testified that he and others had received shocks from the electric cord used by Dunlap; he thought Dunlap was shocked at the time of his death, but changed his mind the next morning after Mr. Stone examined the wiring and cord and told him it was impossible for any one to get a shock from the wire.

The current which the electric cord was carrying at the time of the accident was 115 volts. The cord was double insulated, had an outside and inside insulation, and the outside insulation was frayed, but the evidence shows that the insulation was not worn through to the wire. There was no evidence that Dunlap's attention had been called to the defects in the insulation, or that he knew of the defects, or as to whether or not they were discoverable by the exercise of due care.

Expert testimony introduced by the plaintiff shows that as low as 65-voltage electricity is sufficient to cause death in favorable

3-75

circumstances such as the conditions surrounding the deceased when he came to his death, that is, the body being wet, standing on wet ground, and being in contact with a conductor of electricity such as the iron tank which deceased was leaning against at the time; also that the resistance of the human body is lessened when tired or fatigued and death more readily produced by electric shock; that electric shocks contract the muscles and stiffen and make rigid the human body when the body is charged; that sudden death from heart trouble or from angina pectoris would not cause the contraction of the muscles and stiffening of the body, but, on the other hand, would make the body limp and limber; that there are two classifications of the electric currents, continuous, or direct, and alternating currents; that the alternating current is, relatively speaking, three to four times more dangerous than continuous or direct; the current used by defendant was the alternating; that the contact of a current of electricity sufficient to produce death would cause a mark or burn on the body at the place of contact, but this would not necessarily happen in all cases. Several witnesses testified that they observed on the day of the burial of the deceased that he had a mark or burn across his left hand.

The testimony shows that the deceased was an able-bodied man, a good workman, and always able to perform his work well. However, one or two of the witnesses of defendant testified that deceased complained on the day of his death of feeling badly, and that the master mechanic, Mr. Austin, cautioned him about drinking too much water.

Plaintiff produced witnesses who testified that more modern and up-to-date shops had for some time discarded the use of electric lamps and extension cords such as were used by the defendant, for the reason that the same were dangerous.

The plaintiff testified that the master mechanic, Mr. Austin, when he came to her house, informed her of the death of her husband within a few minutes after the accident, stating that Dunlap was killed.

The two propositions urged on appeal by the defendant which require consideration are: First, that the evidence does not show that the deceased came to his death by shock received from the electric cord; second, that the evidence does not show that the defendant was negligent in providing the deceased with safe tools and appliances with which to perform his work.

While there is some expert testimony that tends to show that the death of the deceased might have been from heart disease, a careful examination of the evidence leads a reasonable mind to but one conclusion, and that conclusion is that the deceased was killed by a shock from the extension electric cord. The evidence is amply sufficient to sustain the findings of the jury on this particular question.

It is the duty of the master to use ordinary care in furnishing his employe a safe place within which to work and safe tools and appliances with which to perform the duties required. Chicago, R. I. & P. R. Co. v. Brazzell, 40 Okla. 460, 138 Pac. 794; Chicago, R. I. & P. R. Co. v. De Vore, 43 Okla. 534, 143 Pac. 864, L. R. A. 1915F, 21.

The degree of care to be exercised by the master in furnishing his employe with safe appliances and tools with which to perform the work required of him is that degree which an ordinary man, where electricity is used, would use under the circumstances. Where electricity is used the degree of care to be exercised by the master in furnishing the employe with appliances is much higher than the ordinary case.

"Electricity is an invisible force, highly dangerous in its use, and those who employ others to work where electricity or other dangerous agencies are used should exercise such care for the safety of the employes as is commensurate with the dangers involved and the competency of the employes." Gunn v. City of Jacksonville, 64 South. 435, 67 Fla. 40; Doyle v. La Crosse City R. Co., 148 Wis. 280, 134 N. W. 364, 8 St. Ry. Rep. 178.

"The employment being a dangerous one, as conceded and asserted by the defendant's counsel, the defendant company, the employer, should be legally held to the greatest care and diligence in the selection of the necessary materials, and everything else calculated to insure the safety of the employe in the prosecution of his work." Clarain v. Western Union Teleg. Co., 40 La. Ann. 182, 3 South. 627.

Where a master employs electricity in his business, he must exercise every reasonable precaution known to those possessed of knowledge requisite to the safe treatment of electricity to protect his servants from injury. 26 Cyc. 1120; Myers v. Portland R. Co., 68 Or. 599, 138 Pac. 213.

The evidence in this case shows that the extension cord to which the electric light was attached was defective; that the superintendent of the shops had knowledge of this defect, and also knowledge that he and other employes of the company had received shocks from the cord. The plaintiff's testimony shows that the use of the electric light from the extension cord had been discarded by the railroad shops that were equip-

ped with the most up-to-date appliances; that it had been discarded because it is considered dangerous, and where it was still in use the employes using it were protected by means of a wooden handle, through which the cord passed at the light.

Taking all these circumstances in consideration, the verdict of the jury in finding that the defendant was negligent is reasonably sustained by the evidence.

The defendant assigned as error the giving of instructions by the court and the refusing to give instructions requested by the defendant. The instructions given by the court, considered as a whole, fairly state the law of the case. The defendant requested 32 separately numbered instructions, and as the instructions given by the court covered all the essential points in the case, it was not error of the court to refuse the giving of the requested instructions, even though they might properly state the abstract propositions of law.

The judgment of the trial court should be affirmed.

## On Rehearing.

RAINEY, J. After a careful examination and re-examination of the record in this case, we are of the opinion that the conclusion of the commissioner is correct, and the judgment should be affirmed. It is true, however, as urged by counsel for defendant, that the commissioner has not discussed one of the principal assignments of error relied upon by it for reversal. During the examination of Dr. McBurney, one of plaintiff's witnesses, plaintiff's counsel read from several medical books and books of science relative to the amount of voltage that would produce death, the witness testifying that he agreed with the author of the text, and it is most earnestly insisted that this was error and prejudicial to the rights of the defendant, for the alleged reason that it was the particular evidence upon which the court based its opinion. While there are some authorities to the contrary, we agree that, according to the great weight of authority, this method of examination was improper and the excerpts from the text were inadmissible, but our examination of the record discloses that this evidence was merely cumulative. Drs. McBurney, Ellis Lamb, and M. C. Conner, regularly practicing physicians who had had some experience in the use of electricity, qualified as expert witnesses, and testified from their general knowledge, obtained from observation and research in their profession, that the voltage was sufficient to produce death. Although reference was made to the medical journals

in the manner above stated while Dr. McBurney was testifying, he testified independently thereof that in his opinion 65 volts of electricity was sufficient to cause death under favorable circumstances, such as existed in this case. Dr. M. C. Conner testified that in his opinion, under the conditions stated in the court's opinion, from 50 volts up might produce death, and Dr. Ellis Lamb testified that 110 volts of electricity might be dangerous to life under the most favorable circumstances, depending upon the length of time connected. Al. Roach, one of plaintiff's witnesses, testified that by coming in contact with a similar domestic wire used in an automobile shop in Clinton he received a shock that knocked him 10 or 12 feet and rendered him unconscious. The defendant did not introduce any medical experts, but relied solely on the testimony of its electrical experts, who testified that 115 voltage was not sufficient to produce death.

This is the second time this case has been to this court; the respective trials resulting in jury verdicts for the plaintiff in the sum of $7,000 and $7,500, respectively. On the first trial defendant offered its expert testimony to the effect that the voltage carried by the electric wire was not sufficient to produce death, and the plaintiff relied upon the circumstances of the case without offering any expert or opinion evidence. After having fully stated the facts of the case and after having found against the defendant company on every issue except the probative effect of the expert evidence, the court, in an opinion by Commissioner Mathews (Clinton & O. W. R. Co. v. Dunlap, 56 Okla. 755, 156 Pac. 654), with reference to this testimony, said:

"There was no attempt made upon the part of the plaintiff to meet or discredit this testimony. It stands in the record uncontradicted, and is not the kind of testimony that can be ignored or dismissed as unreasonable and not worthy of credit. It devolved upon the plaintiff to meet it, and, failing so to do, we are of the opinion the case failed with it."

It will readily be seen from the quoted language that in the former opinion the court gave the defendant's expert testimony all the weight it was entitled to, and more than it is given in many jurisdictions, and it was solely on the ground that this testimony was not contradicted or discredited the cause was reversed for a new trial. Now, in the instant case plaintiff, in our opinion, abundantly proved by expert witnesses that the voltage received by the deceased was sufficient, under the circumstances of the case, to cause death, which is also the logical deduction to be drawn from the circumstances, and the error of the court in per-

mitting cumulative evidence to be introduced cannot be said to have substantially prejudiced the rights of the defendant. By the express provisions of section 6005, Rev. Laws 1910, we are prohibited from setting aside a judgment in any case on the ground of the improper admission or rejection of evidence, unless we can say, after an examination of the entire record, that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right. All the witnesses to the accident resulting in the deceased's death believed at the time that he was killed by an electric shock. This is the conclusion reached by two juries, whose verdicts were approved by the trial court, and after an examination of the entire record we cannot say that justice has miscarried, but, on the contrary, we are convinced that the deceased received an electric shock in the manner contended by plaintiff, and that his death was proximately caused thereby.

OWEN, C. J., and HARRISON, PITCHFORD, JOHNSON, HIGGINS, and McNEILL, JJ., concur.

KANE and SHARP, JJ., dissent.