Argued March 28, reversed and remanded May 29, rehearing denied November 7, 1923.

## McCAULEY v. STEAMSHIP "WILLAMETTE" ET AL.

### (215 Pac. 892.)

**Appeal and Error—Verdict cannot be Disturbed, if Supported by Evidence, Though Contradicted.**

1. A finding by a jury, in a suit under the boat lien law (§§ 10281–10297, Or. L.), that the work of snaking sling loads along the floor of a deck of a vessel jarred the dock, could not under the Constitution be disturbed, where there was testimony to support the finding, though the testimony was contradicted.

**Action—In Suit Against Two Defendants, Injured Employee Could not Join Action Under Employers' Liability Act With Suit in Equity Against Vessel.**

2. Though plaintiff, seeking recovery against a vessel under the boat lien law (§§ 10281–10297, Or. L.) for injuries sustained while loading lumber from a dock to a vessel, was entitled to have the cause tried as a suit in equity, he was not entitled to join in the same complaint an action at law under Employers' Liability Act (§ 6785, Or. L.) against the lumber company owning the dock, with a suit in equity against the vessel, and then try the cause of action and cause of suit as a single action at law.

**Shipping—If Employers' Liability Act Applied to Injury to Longshoreman on Dock, It Came Under "and Generally" Clause of Employers' Liability Act.**

3. Where plaintiff longshoreman was injured while loading lumber from a dock to a ship, and at a place on the dock 40 and 120

---

3. Constitutionality, application and effect of federal Employers' Liability Act, see notes in 17 Ann. Cas. 331; Ann. Cas. 1918A, 1070; 47 L. R. A. (N. S.) 38; 48 L. R. A. (N. S.) 987; L. R. A. 1915C, 47.

feet from the edge thereof, *held* that, if plaintiff's case is governed by the Employers' Liability Act (§ 6785, Or. L.), it is governed only because it is embraced by the "and generally" clause, providing that persons having charge of any work involving risk or danger to employee shall use every device for their protection, and is not governed by that clause of the act relating to a structure more than 20 feet from the ground, notwithstanding that the floor of the dock on which plaintiff was injured was more than 20 feet from the ground at its edge.

**Trial—Assuming That Plaintiff's Work Involved Risk Within Employers' Liability Act, Held Reversible Error.**

4.    In an action under Employers' Liability Act (§ 6785, Or. L.) for injuries sustained by plaintiff longshoreman from a falling piece of timber while engaged in loading lumber from a dock to a vessel, in which action defendant denied plaintiff's basic allegation that plaintiff's work was one involving risk or danger within the act, *held,* that it was reversible error for court to assume that the work was one involving risk or danger within the act, instead of submitting that question to the jury.

**Negligence—Employers' Liability Act not Applicable to Company Piling Lumber on Dock, Where Laborer Under Control of Captain was Injured While Loading It on Ship.**

5.    Where the piling of lumber on a dock by a lumber company had been completed three weeks before a ship came for the lumber, and nothing remained to be done with the lumber, except to load it on the ship, and the work of loading it was entirely under control of the captain of the ship, and plaintiff longshoreman was its employee, and took orders direct from the captain, and was paid by him, *held,* that for injuries sustained by plaintiff while loading the lumber the Employers' Liability Act (§ 6785, Or. L.), requiring persons having charge of work involving risk or danger to use every device for protection to employees, did not apply to the lumber company.

From Multnomah: ROBERT G. MORROW, Judge.

Department 1.

Charles McCauley, a longshoreman, was injured on a dock while engaged in loading lumber upon a sling block to be delivered to the hold of the steamship "Willamette" which was moored to the dock for the purpose of receiving the lumber. The Columbia County Lumber Company, a corporation, owned the dock. The Willamette Steamship Company owned the steamship. McCauley sued the steamship "Willamette" and the Columbia County Lumber Company for damages. Proceeding under what is sometimes

called the boat lien law, being Sections 10281 to 10297, Or. L., inclusive, the plaintiff ,caused the vessel to be arrested. The Willamette Steamship Company, as owner and claimant of the vessel, acting under Section 10289, Or. L., filed an undertaking, and upon its approval by the court the vessel was discharged from further detention by the sheriff. A trial resulted in a general verdict "in favor of the plaintiff and against all of the defendants." In addition to the general verdict the following question was submitted to the jury and the following answer made by them:

"If you find the plaintiff was injured, was such injury caused by the movement of steamship 'Willamette' against the dock or the operation of any of its tackle and gear?

"Yes."

A joint and several judgment was entered against the Columbia County Lumber Company, the steamship "Willamette" and against the Willamette Steamship Company, owner and claimant of the vessel, as well as against the surety on the undertaking given by the Willamette Steamship Company. The Columbia County Lumber Company and the Willamette Steamship Company, acting separately, appealed from the judgment.

REVERSED AND REMANDED.   REHEARING DENIED.

For appellant Willamette Steamship Company there was a brief over the names of *Messrs. McCutcheon, Olney, Willard, Mannon & Greene, Messrs. McCamant & Thompson* and *Mr. Ralph H. King,* with an oral argument by *Mr. King.*

For appellant Columbia County Lumber Co., there was a brief over the names of *Messrs. Wilbur,*

*Beckett & Howell* and *Mr. Eugene K. Oppenheimer,* with an oral argument by *Mr. Oppenheimer.*

For respondent there was a brief over the names of *Messrs. Griffith, Leiter & Allen* and *Mr. Bert W. Henry,* with an oral argument by *Mr. Henry.*

HARRIS, J.—The waters of the Willamette River before emptying into the Columbia River divide, and the main body goes to the right and the remnant to the left of an island. The branch going to the left is known as Willamette Slough. The plant of the Columbia County Lumber Company, since destroyed by fire, was located at a point on Willamette Slough. The dock was about 700 feet long and about 400 feet wide. The dock was constructed of heavy flooring placed upon piling driven into the earth. At the outer edge of the dock the floor was between 35 and 50 feet above the bottom of the slough. The piles were swaybraced and the structure was strongly built. The flooring was laid at right angles to the edge of the dock so that sling loads when drawn from the dock toward a moored vessel would be drawn along the length of and not across the planking.

The sawmill operated by the Columbia County Lumber Company was, according to the estimate of one witness, about 2,000 feet from the dock. The lumber company had received some orders from the Standard Oil Company to cut lumber to be shipped to California there to be used in the construction of oil rigs. While the number and the lengths and sizes of the pieces used in the construction of oil rigs were substantially the same for each oil rig, yet it was necessary to keep the lumber for each oil rig separated from the rest. The lumber company cut the

pieces in accordance with the orders and piled the pieces upon the dock from which they were subsequently to be taken and loaded into a vessel for shipment to California. The lumber for each oil rig was piled in a single pile separate and apart from every other pile. The width of each pile was about 28 feet; the longest piece in the pile was 32 feet and 16x16 inches in size; and at its highest point each pile was about 7 feet high. Each pile contained about 32,000 feet of lumber. The timbers which were long and of large sizes were placed upon the bottom of the pile. All the pieces were piled at right angles to the edge of the dock. The piles were "five deep" from the edge of the dock. There was a space between the ends of the piles; and between the sides of the piles was an alley about two feet wide.

About three weeks after the Columbia County Lumber Company had completed the delivery of the lumber upon the dock, the steamship "Willamette" arrived and was moored to the dock for the purpose of taking on the lumber. The vessel has a single hatch; between the hatch and the bow is a mast and between the hatch and the stern of the vessel is another mast. Attached to and connected with each mast are booms, blocks, cables and winches which were operated and propelled by steam power generated upon the vessel. The inshore booms extended five or six feet over the dock. The gear connected with the forward mast is referred to as the forward gear and the other as the after gear.

The vessel was moored with the bow pointed south or upsteam and with the starboard side to the dock. In order to keep the lumber in each pile separate when loaded in the vessel, all the lumber in one pile was loaded and marked before any lumber was taken

from another pile. Four longshoremen served each gear. Two of each crew of four were stationed at the pile of lumber and they took lumber from the pile and placed it upon a sling block. When a sling load was ready to be taken aboard the vessel the other two longshoremen, known as rigging rustlers, fastened the gear to the sling block, and the sling load was then by means of the gear "snaked" along the floor of the dock until the edge of the dock was reached and then the load was hoisted from the dock, was swung over the hatch and lowered into the hold of the vessel. The two longshoremen who "rustled gear" then pulled the gear back to the pile for another sling load. The four longshoremen who served the forward gear loaded from the south side and the four who served the after gear loaded from the north side of each pile. In order to keep all the members of the crew busy it was necessary for the longshoremen who were loading lumber upon the sling blocks to work fast.

McCauley was one of the four men who served the after gear. He and Simons, his "working partner," were taking lumber from the pile and loading it upon a sling block. McCauley stood at the inshore end and Simons at the other end of the pile, and they loaded with McCauley handling one end and Simons the other end of each timber loaded. The pile at which McCauley was hurt was, according to the captain of the vessel, the fifth pile from the edge of the dock; but according to the testimony of the four men who served the after gear it was the second or third, probably the second, pile from the edge of the dock. Whether the injury occurred at the second or the fifth pile is of no importance except so far as the issue of vibration of the dock may be affected. An

average sling load contained six or seven hundred
feet of lumber; the sling loads varied from 1,500 to
4,000 pounds in weight.

The lumber composing the oil rig orders was piled
in the customary manner. The only fault found
with the piling by any witness related to the single
piece which injured the plaintiff. The method usually
followed is, if practicable, to pile the lumber in tiers
twelve inches wide. This is done so that the long-
shoremen can take down and move a whole tier, and
as the work progresses gradually widen the space
between the piles, thus affording more room on the
floor of the dock in which to handle the sling blocks
and the lumber.

The evidence makes it appear that several sling
loads, which had been loaded by McCauley and Simons,
had been moved from the pile. Although the evi-
dence shows that the four men who served the for-
ward gear were at work on the south side of the pile
we cannot know how much lumber was moved from
that side of the pile except that it is made to appear
from the testimony that they had not worked in as far
as the piece which fell upon McCauley. It is difficult
definitely to understand some of the details because
a blackboard was used and witnesses employed the
terms "these," "that," "here," and "there," words
which were sufficiently definite when referring to a
diagram on the blackboard but indefinite and uncer-
tain when read as a part of the paper record. How-
ever, it is our understanding that two tiers had been
entirely removed by McCauley and Simons and
that all the pieces in the third tier had been re-
moved except a very heavy piece known as a
walking-beam; and it is possible, although it does
not clearly appear, that all of the fourth tier

had been removed except the bottom piece which was also a walking-beam. This heavy beam known as a walking-beam was 28x28 inches at the middle and from the middle was sawed on one side so as to taper to 12 inches at the ends. The record does not inform us as to the length of this timber; but we infer that it was a long timber, possibly 28 or 30 feet long. The longshoremen use hooks with which to handle the pieces. Standing on a walking-beam and about halfway between the middle and the end of it McCauley, probably assisted by Simons at the other end, pulled down a tier. The walking-beam upon which McCauley was standing had been placed on the dock with the straight side down and consequently the place at which McCauley was standing was probably between 14 and 18 inches above the floor of the dock. The tier next to the one so torn down consisted of a walking-beam on top of which lay a piece 12x12 and on top of that piece was the piece which fell upon McCauley. The piece which fell upon Mc-Cauley was, according to Simons, 18x18 or 24x24 and six or eight feet long. This piece was lying "diagonally" and "on a balance" so that a part of it was on one tier and a part was on another tier. Simons noticed the piece lying in this position a half an hour before it fell upon McCauley; and Jensen, one of the two men who were rustling rigging for the after gear, noticed it three-quarters of an hour before the accident. McCauley saw the block before the injury, but did not notice its position, because he was too busy loading the sling blocks. If any language of the complaint is construed to mean that the plaintiff charges that the piece which injured him fell from a pile other than the one upon which he was working, then it must be said that such a construc-

tion is not supported by any evidence whatever, because all the testimony was to the effect that the piece fell from the pile from which McCauley was loading upon the sling block. There is evidence from which it can be inferred that McCauley was hurt while pulling down the tier of lumber; and so, too, there is evidence from which it can be inferred that he was injured while making ready to load timber on a sling block after having torn the tier down. The piece which struck McCauley was a comparatively short one and was lying at the end of the pile and in a diagonal position. At the time of the injury the plaintiff was about ten feet from his end of the pile. When the piece fell McCauley naturally had his back to the piece, because whether engaged in tearing a tier down or engaged in loading a piece upon the sling block the short piece being at the end of the pile would naturally be at his back. The testimony of Simons tends to indicate that the tearing down of the tier was the immediate cause of the piece falling upon McCauley. The testimony of Jensen was to the same effect and is as follows:

"I was standing there and he [McCauley] was tearing * * this tier down. * * You get a hook into it and roll it down and he was standing right there, had one leg kind of right inshore of the pile he was tearing down and the other leg out kind of bracing himself up; a man has got to get a bracing; when he is pulling away this here tier fell down, it seemed like it jarred a little bit, jarred enough to knock this timber over and it kind of slipped down on his leg. I was looking at it and saw it at the time it came; * * It kind of slipped down on his leg and caught him on the ankle * * ."

The complaint was drawn upon the theory that both the Columbia County Lumber Company and the

steamship were liable, and that our state Employers' Liability Act measured the liability of each defendant. The complaint alleges that the work in which McCauley was engaged was one involving risk and danger, and in this connection the complaint, among other things, contains the following:

"That the said dock was built high upon piling and sling loads of lumber of great weight were being handled, hoisted and lowered upon said dock by machinery, and the lumber piled thereon was piled in an irregular manner and without any lateral support, and the jar and movement of the dock and the ship's tackle, because of the handling of the lumber thereon by the ship's tackle and by the stevedores, was liable to cause said lumber piles to tip over and fall, and the said sling loads were liable to and did swing in various directions as they were being hoisted or lowered upon said dock, all of which was well known to and appreciated by the defendants, but notwithstanding the defendants wholly and entirely failed, omitted and neglected to use every device, care or precaution which it was practicable to use for the protection and safety of the life and limbs of this plaintiff * * * ."

The complaint specifies the acts of alleged negligence as follows:

"The defendants had caused heavy timbers to be piled upon said dock immediately behind and close to the pile on which plaintiff was working, and the said heavy timbers were so piled that those on top did not rest squarely upon those underneath but extended out over the edge thereof, and, while this plaintiff was about his duty of building a sling load of lumber, a sling load of lumber, being removed by the ship's tackle from the opposite side of the pile from which plaintiff was working, was so carelessly and negligently swung against the dock and the lumber piled

thereon, that one of the heavy timbers which was piled just behind where plaintiff was working, fell to the surface of the dock * * .

"They piled the said heavy timber upon the edge of the timber next below and without any support to keep it from falling off, so that when the timbers adjacent and near thereto were necessarily removed to make up said sling load of lumber, and on account of the jarring and movement aforesaid, the said heavy timber, so negligently piled as aforesaid, suddenly and unexpectedly, and without any notice to the plaintiff, fell from a portion of a pile of lumber behind plaintiff, thereby injuring him as aforesaid.

"That the ship's winches and tackle were handled and operated in such manner as to strike heavy sling loads of lumber violently against the dock and against the lumber piles on said dock, thereby shaking and jarring the whole dock and the lumber thereon.

"In that they failed to use any device, care or precaution whatsoever for the safety of the life and limbs of this plaintiff, although it would have been practicable and expedient to pile the said lumber regularly and squarely one piece on top of the other, and to handle the ship's tackle in such manner that sling loads of lumber would not be bumped violently against the dock or the piles of lumber thereon."

1. There was no evidence to sustain the allegation that a sling load removed by the forward gear from the south side of the pile was swung against the dock or against the lumber piled thereon and thus caused the injury. While it is conceded by all parties that the forward gear was kept moving just as was the after gear, a finding that a sling load taken from the south side of the pile struck against the pile of lumber or against the dock and was the immediate cause of the falling of the piece that struck plaintiff, would, on the record presented to us, amount to a mere guess, especially in view of the testimony of the wit-

nesses who saw the accident and observed the stick before and at the time it fell upon McCauley. Furthermore, there is no evidence that any sling load at any time struck any pile of lumber. It is true that there was some testimony, though contradicted, from which an inference could be drawn to the effect that, speaking generally, the work of snaking the sling loads along the floor of the dock of the vessel jarred the dock; and consequently a finding to that effect made by the jury could not under our Constitution be disturbed.

The plaintiff sued the Columbia County Lumber Company and the steamship "Willamette" as joint defendants. In thus suing the vessel the plaintiff availed himself of the boat lien law and consequently in so doing joined an action at law against the lumber company with a suit in equity against the vessel. If the question as to whether or not a proceeding against a vessel under the chapter known as the boat lien law is to be prosecuted as an action at law or as a suit in equity were *res integra,* the writer would have difficulty in agreeing with the view that it is to be prosecuted as a suit in equity. But however that may be, the question is one merely of procedure, of adjective law; and whether the proceeding is prosecuted as an action at law or as a suit in equity the question of whether a plaintiff is entitled to recover at all and if so how much is a matter of substantive law, and the ultimate right of the plaintiff is the same whether the proceeding is under one mode or the other; and therefore since in *Cordrey* v. *Steamship "Bee,"* 102 Or. 636 (201 Pac. 202, 20 A. L. R. 1079), it was determined that the statute contemplated that the proceeding shall be prosecuted as a suit in equity the rule there announced ought, in the interest of

certainty of the law, to be continued and not disturbed.

2. The defendants objected to the complaint upon the ground that it embraced a suit in equity together with an action at law. It is appropriate to add that the instant case was tried before the announcement of the decision in *Cordrey* v. *Steamship* "*Bee.*" Under the doctrine of *Cordrey* v. *Steamship* "*Bee*," the claimant was entitled to have the cause tried as a suit in equity; and the plaintiff was not entitled to join in the same complaint an action at law against the Columbia County Lumber Company with a suit in equity against the vessel and then try the cause of action and the cause of suit as a single action at law.

3. If the work in which plaintiff was engaged came within the Employers' Liability Act it was brought within the act only because of the "and generally" clause of Section 1 of the act. It is true that the floor of the dock was, at the edge of the dock, more than 20 feet from the ground; but that clause of the act which relates to a structure more than 20 feet from the ground has no application to the place where the plaintiff was working. The question here involved is not whether the defendants were negligent in not sufficiently securing the dock from swaying and in not properly guarding it with a rail so as to prevent a person from falling from the dock. The plaintiff was not hurt by a fall from the dock; he was injured on the dock and while at work on the dock at a place between 40 and 120 feet from the edge of the dock. Hence, if the instant case is governed by the Employers' Liability Act it is so governed only because it is embraced by the language of the "and generally" clause.

4. The allegations upon which the plaintiff based his claim that the work which he was doing was one involving a risk or danger were denied by the defendants. An issue was therefore raised between the plaintiff and the defendants as to whether or not the work was one involving risk or danger within the meaning of the Employers' Liability Act. The court did not submit that issue to the jury; but the court assumed that the Employers' Liability Act governed the defendants and in substance told the jury that it was the duty of the defendants to comply with the act and that if the defendants failed to exercise the care required by the statute they were liable. Cases may occur where the court can say as a matter of law that the work did not involve a risk or danger within the meaning of the statute; *O'Neill* v. *Odd Fellows' Home,* 89 Or. 382 (174 Pac. 148); and undoubtedly many injuries may occur where the court can say as a matter of law, and accordingly ought to instruct the jury, that the work in which the injured person was engaged was one involving a risk or danger within the meaning of the "and generally" clause of the Employers' Liability Act; but in the instant case the question was one which ought to have been submitted to the jury for decision: *Wolsiffer* v *Bechill,* 76 Or. 516, 526 (146 Pac. 513, 149 Pac. 533); *Yovovich* v. *Falls City Lumber Co.,* 76 Or. 585, 592 (149 Pac. 941); *Mackay* v. *Commission of Port of Toledo,* 77 Or. 611, 616 (152 Pac. 250); *Wheeler* v. *Nehalem Timber Co.,* 79 Or. 506, 510 (155 Pac. 1188); *Poullos* v. *Grove,* 84 Or. 106, 113 (164 Pac. 562); *Rorvik* v. *North Pacific Lumber Co.,* 99 Or. 58, 71 (190 Pac. 331, 195 Pac. 163). Therefore, the judgment must be reversed, among other reasons, because the court

assumed as a matter of law that the Employers'
Liability Act applied.

5. But the "and generally" clause did not govern
the lumber company. The piling of the lumber had
been completed about three weeks before the steam-
ship came for the lumber. The work of the lumber
company was ended when the piling of the lumber
was completed. Nothing more remained to be done
with or about the lumber except to load it upon the
vessel; and the work of loading the lumber was en-
tirely under the control of the captain of the ship.
McCauley and all the other longshoremen were "em-
ployees of the ship," took their orders "direct from
the captain of the ship," and were paid by the cap-
tain. The language of the "and generally" clause
is: "Having charge of, or responsible for, any work
involving a risk or danger to the employees." The
only work being done was the work in which the
steamship alone was engaged and for which it, or
its owner, was responsible. Not a single employee of
the lumber company was at work anywhere upon or
about the dock. The lumber company had done noth-
ing on the dock for three weeks. We are not now
concerned with any inquiry about the degree or ex-
tent of the common law duty of the lumber company;
for our only inquiry now is whether or not the Em-
ployers' Liability Act was applicable to the lumber
company. To apply the Employers' Liability Act to
the lumber company in the attending circumstances
would be judicially to extend the statute far beyond
the intent of the enactment as that intent is gathered
from the wording of the act and the history of its
adoption. The instant case is readily distinguishable
from *Rorvik* v. *North Pacific Lumber Co.,* 99 Or. 58

(190 Pac. 331, 195 Pac. 163), for there Rorvik was at work and the North Pacific Lumber Company was also engaged in work; and the work being done by the employees of the lumber company caused the death of Rorvik.

The judgment is reversed and the cause is remanded for such further proceedings as may be consistent with this opinion.

REVERSED AND REMANDED. REHEARING DENIED.

McBRIDE, C. J., and BURNETT and RAND, JJ., concur.