Argued January 24; reargued March 31; affirmed May 19;
rehearing denied July 7, 1936

# FERRETTI *v.* SOUTHERN PACIFIC CO. ET AL.

(57 P. (2d) 1280)

*Paul R. Harris,* of Portland (Davis & Harris, C. W. Robison, and Charles J. Stocklen, all of Portland, on the brief), for appellant.

*Clarence J. Young,* of Portland (Alfred A. Hampson, of Portland, on the brief), for respondents.

BELT, J. This is a personal injury action. The cause was submitted to the jury solely under the provisions of the Oregon Employers' Liability Act, in accordance with the theory of plaintiff, and a verdict was rendered against both defendants in the sum of $15,000. On motions of the defendants, the trial court set aside the judgment and ordered a new trial for the following reasons: (1) Error committed in denying the motions of the defendants for nonsuit and a directed verdict, based on the contention that the Employers' Liability Act had no application to the facts in the case and that there was no evidence of negligence. (2) Error committed in entering judgment against the defendant Kubler in that, under the Employers' Liability Act "there can be no award of damages against the employee who was alleged to have been in charge of the work involved". From the order setting aside the judgment and allowing a new trial, the plaintiff appeals.

A statement of the facts in the light most favorable to plaintiff is in order to determine whether the cause should have been submitted to the jury. Plaintiff, who is 55 years of age, had been in the employ of the Southern Pacific Company for about ten years as a boiler maker helper. It was his business to assist in the repair of locomotive boilers. A compressed air gun, weighing approximately 50 pounds, was often used in such work. In riveting stay-bolts the boiler maker would operate the gun and the plaintiff would hold a 12- or 15-pound sledge hammer against the bolt while the hammering

on it was being done. In other kinds of work the plaintiff would hold this heavy air gun above his head while the boiler maker controlled its operations. It was, indeed, hard manual labor and, according to the evidence offered on behalf of the plaintiff, the operation of this machine resulted in severe vibration and shock to the employee who was obliged to hold it in proper position.

■ On January 27, 1932, the plaintiff, while in the employ of the defendant company, fell from a locomotive upon which he was working and sustained a fracture of the radius of his right arm. He was under the care and treatment of the Southern Pacific Company's physician, Dr. Berkeley, for about three months. At the end of this period a settlement was had covering the injuries sustained in this accident and the plaintiff returned to work in April, 1932. No controversy is here involved concerning the validity of such settlement. Plaintiff testified that just before returning to work Dr. Berkeley told him that his arm was "perfectly all right to go to work" and that he could do "easy work" or "light work" and that he gave him a "slip" to take to the company's claim agent, Mr. Stewart. Dr. Berkeley denies having had such conversation with the plaintiff, but admits that he gave him a "slip" or hospital certificate—which was introduced in evidence—merely showing that plaintiff "will be able to report for duty on April 19, 1932". There was no statement in the certificate limiting the work to "light work" or "easy work". Plaintiff further testified that he called on Mr. Stewart, the claim agent, signed the release for injuries received in January, received in consideration therefor back wages during time he was laid off, and that thereupon Stewart telephoned to the defendant Kubler, the general foreman of the Brooklyn yard car shops and

told him to "give me light work". The claim agent denies giving such directions to the general foreman. Plaintiff thus testified about his conversation with Kubler on the night he went to work:

"A. Well, he told me that he,—'you can go to work?' I says: 'Yes, sir.' And I says 'what kind of job you give me?' He says: 'The same job, boiler maker helper.' And I says, I says: 'I can't take that job because my arm is so sore, a little sore yet, a little sore yet on account of my muscle; it is kind of tender yet.'

"Q. You mean your muscles were weak? A. Yes, weak. And I says: 'I can't go on that buck-up.' He said: *'You take that job because I don't have nothing else'.*" [Italics ours.]

Two days later, according to plaintiff's testimony, in response to his statement that the work was too hard for him, Kubler replied, "You stay on that job or quit". Plaintiff worked a week longer and again made complaint to the general foreman but received the same answer, "Stay on the job or quit". Kubler denies such conversation. Plaintiff also testified that he then complained to Louis Roehrig, the foreman of boiler makers, that the work was too hard for him, and that Roehrig said "We don't got nothing else for you to do and you want to stay on that job, all right; if you don't you know what you are going to do quit." However, plaintiff continued to work at such job for about three months before quitting on August 2, 1932. The evidence offered on behalf of the defendants tended to show that plaintiff quit because of a quarrel with Flaherty, the boiler maker under whom he was working. In view of the legal questions involved, all these issues of fact must be resolved in favor of the plaintiff. His testimony must be accepted as true and he is entitled to rely upon every reasonable deduction that may be drawn therefrom.

Plaintiff claims that as a result of being ordered and directed to do this work above mentioned, in his physical condition, his right arm was "badly twisted, displaced, and forced back", and that he is permanently injured. There is some evidence tending to show permanent injury. The evidence offered on behalf of the defendants —especially comparison of radiographs taken after the injury in January with those taken after plaintiff quit in August and prior to trial—indicates that there was no substantial change in the condition of plaintiff's right arm.

The specific charges of negligence against the defendants as alleged in the complaint are as follows:

"(a) That although plaintiff's right arm was in a weakened condition, as defendants well knew, and the latter were instructed to place plaintiff at light work, the defendants carelessly and negligently placed plaintiff at work which was beyond his capacity and which exposed plaintiff to unusual danger and peril by reason of his physical weakness, said work consisting mainly of operating certain heavy air guns and heavy motors in the plant and repair shops of defendant corporation;

"(b) That defendants further, carelessly and negligently placed and caused the plaintiff to continue at work for a considerable period of time which, because of plaintiff's physical weakness, he could not reasonably guard or defend himself against, although the defendants well knew that said work subjected plaintiff to unusual hazards and danger;

"(c) That said defendants, carelessly and negligently, ordered, directed and required plaintiff to perform heavy work although defendants knew and understood the unfitness and incapacity of plaintiff to perform the work demanded;

"(d) That, although the work that plaintiff was required to perform involved a risk or danger to him, the defendant corporation, carelessly and negligently,

failed to exercise every device, care and precaution which it was then and there practicable to use, in that, instead of exercising the precaution of giving plaintiff light employment, said defendant corporation, on the contrary, employed plaintiff as above alleged.''

The defendants deny generally the allegations of negligence and allege affirmatively the defense of assumption of risk.

No contention is made by counsel for plaintiff that recovery could be had under the common-law rules of negligence. It is clear that plaintiff fully understood and appreciated the risks incident to his employment. He, as well if not better than his employer, knew whether the work in which he was engaged was beyond his physical capacity. See *Ehrenberger v. Chicago R. I. & P. Ry. Co.*, 182 Iowa 1339 (166 N. W. 735, 10 A. L. R. 1388); *Worlds v. Georgia R. Co.*, 99 Ga. 283 (25 S. E. 646); *Leitner v. Grieb*, 104 Mo. App. 173 (77 S. W. 764), and *Williams v. Kentucky River Power Co.*, 179 Ky. 577 (200 S. W. 946, 10 A. L. R. 1396), wherein recovery was denied in personal injury actions based upon the alleged negligence of the employer in ordering and directing an employee to do work beyond his known physicial capacity. Counsel for plaintiff frankly concede that the sole question presented on this appeal is whether the Employers' Liability Act applies. No attention need be given to cases involving the common-law rules of negligence. The cause of the plaintiff must stand or fall upon the applicability of the above act.

Throughout the years since the Employers' Liability Act was enacted this court has consistently held that, even though it should be liberally construed, it did not apply to every case where an injury occurred through the alleged negligence of the employer, although the title to the act, when considered without

regard to the context, is broad enough so to include. The context of the act is more limited in its scope than the title thereof.

■ Plaintiff does not contend that the instant case comes within the first part of section 1 of the act, but relies upon the following clause, "* * * and generally, all owners, contractors or subcontractors and other persons having charge of, or responsible for, any work involving a risk or danger to the employees or the public, shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance or devices." Ordinarily, whether a work involves a risk or danger is a question of fact for the jury: *Fitzgerald v. Oregon-Washington R. & N. Co.*, 141 Or. 1 (16 P. (2d) 27). In some cases, however, the court has declared, as a matter of law, that a risk or danger was involved: *McCauley v. S. S. Willamette*, 109 Or. 131 (215 P. 892). In other cases it has likewise declared, as a matter of law, that the work did not involve risk or danger within the meaning of the act: *Hoffman v. Broadway Hazelwood*, 139 Or. 519 (10 P. (2d) 349, 11 P. (2d) 814, 83 A. L. R. 1008). In the broadest sense, every injury involves a risk or danger. Otherwise the injury would not have occurred.

During the first few years that this act came before the court for consideration, it was generally held that the act covered only those cases of employers' liability specifically enumerated therein and that the "and generally" clause amounted only to a reiteration of the preceding provisions of section 1 of the act. See *Isaacson v. Beaver Logging Co.*, 73 Or. 28 (143 P. 938);

*Schulte v. Pacific Paper Co.*, 67 Or. 334 (135 P. 527, 136 P. 5); and *Schaedler v. Columbia Contract Co.*, 67 Or. 412 (135 P. 536). In *Schulte v. Pacific Paper Co.*, supra, the court said: "This statute does not cover every case of an employer's liability to his employee, but only the specific cases enumerated in the act". However, as said in *Hoffman v. Broadway Hazelwood*, supra, this court, in later cases, has given a much more liberal interpretation to the act and has held consistently that the cases of employers' liability are not limited to those specified in section 1, but that, if reliance is had on the "and generally" clause, the case must be one of the general kind mentioned specifically in the preceding parts of the act: *Freeman v. Wentworth & Irwin*, 139 Or. 1 (7 P. (2d) 796; *Bottig v. Polsky*, 101 Or. 530 (201 P. 188).

■ If it be assumed that the work involved a risk or danger within the meaning of the act, it was the duty of the employer to "use every device, care and precaution which it is practicable to use for the protection and safety of life and limb". Liability can not be predicated upon the mere fact that the work involved a risk or danger. The plaintiff must go further and show a breach of duty on the part of the company. In all the cases before this court where the act has been applied there was involved either some defect in the machinery or structure; failure to use proper safety devices, appliances, or guards; unsafe place in which to work; or improper method or manner of conducting operations. Never before has it been contended that the act was applicable to a state of facts similar to those upon which the instant action is based.

■ We are confronted then with the question: Was it actionable negligence for the defendant company to

direct or permit the plaintiff to engage in work beyond his physical capacity, when it was the only work available? If the act is to be construed in accordance with the contention of the appellant, it would make the employer practically an insurer. In the instant case, the plaintiff, according to his own testimony, was given the only job available. Can it be that the defendants must pay $15,000 because, peradventure, the work was not suited to his physical condition? Was the defendant, regardless of the seniority rights of other employees, negligent because it did not create a job in keeping with the physical capacity of the plaintiff? It is suggested that there is evidence that the claim agent Stewart promised plaintiff "light work". If he did, he was acting beyond the scope of his employment. His business was to settle and adjust claims. He had nothing to do with the operation of the company's car shops. Furthermore, this is not an action for breach of contract. We are convinced that the act, under its most liberal construction, was never intended to give redress in an action of this kind. Since the act, in our opinion, has no application and there plainly could be no recovery under the common law rules of negligence, the defendants were entitled to a directed verdict.

At this juncture it is well to bear in mind that we have not before us a case involving defective machinery or appliances; negligent manner or method of operation (*Bottig v. Polsky,* supra) ; or failure to provide a reasonably safe place in which to work (*Fitzgerald v. Oregon-Washington R. & N. Co.,* supra). Neither does it involve accidental injury.

In our opinion, *Bevin v. Oregon-Washington R. & N. Co.,* 136 Or. 18 (298 P. 204), has no application to the case at bar. In the Bevin case the use of a defective tool

was involved. Furthermore, that case was tried under the Federal Employers' Liability Act. Neither is *New York Central & H. R. R. Co. v. Vizvari*, 210 F. 118 (L. R. A. 1915C, 9), in point for in that case the employee was also working with a defective tool. Appellant relies strongly upon *Fitzgerald v. O.-W. R. & N. Co.*, supra, and *Bottig v. Polsky*, supra. We think these cases do not support his contention. In the one first cited the facts disclose a failure to furnish plaintiff therein a reasonably safe place in which to work, in that the stairway on which he was injured was unlighted. The second case involved the negligent manner or method of loading barrels in a box car.

■ A discussion of the doctrine of assumption of risk is not pertinent to the issues for, if the Employers' Liability Act applies, assumption of risk is no defense: *Freeman v. Wentworth & Irwin*, supra; *Peluck v. Pacific Machine & Blacksmith Co.*, 134 Or. 171 (293 P. 417); *Poole v. Tilford*, 99 Or. 585 (195 P. 1114). Hence no discussion of cases concerning such doctrine will be made. The case under consideration was submitted to the jury solely under the Employers' Liability Act (§§ 49-1701 to 49-1705, inclusive, Oregon Code 1930).

The order of the trial court setting aside the judgment and granting a new trial is affirmed.

RAND, ROSSMAN, and BAILEY, JJ., concur.

---

CAMPBELL, C. J. (dissenting). Plaintiff commenced this action to recover damages for alleged personal injuries received while in the employ of defendant, Southern Pacific Company, a corporation. For many years plaintiff was in the employ of defendant corporation as a boilermaker's helper in its yards and

repair shops at Brooklyn in the city of Portland. Defendant Kubler was the foreman in charge of said shops. On the 27th of January, 1932, while in said employment, plaintiff sustained a fracture of the radius of his right arm. For about three months thereafter, by reason of said injury, he was under the care and attention of a physician employed by defendant corporation. During this time, in accordance with the humane policy of the defendant corporation, Southern Pacific Company, plaintiff was paid the same wages as if he had been at work all the time, so that in reality he was in the employ of the company continuously.

In the latter part of April, 1932, he returned to work and worked up until August of the same year. He alleges that the fracture of his arm left it in a weakened condition; that the physician who treated him advised him and defendant corporation, in the latter part of April, 1932, that he was sufficiently recovered to perform light work; that he reported to a Mr. Stewart, a claim agent for the company, who told him to go to defendant Kubler, the foreman of the shops, and he would be given light work; that, upon reporting to Mr. Kubler, he was instructed by Kubler to resume the job that he had formerly been employed on; that the work was hard and laborious and beyond his physical capacity by reason of the weakness of his fractured arm; that in performing this work, the fractured bones became displaced and the ends out of apposition; and that eventually, by reason of such heavy work, his right arm became useless and the injury became permanent.

The defendants answered jointly and, in effect, admit that plaintiff was in the employ of defendant corporation as a boilermaker's helper and that in January, 1932, he suffered a fracture of his right arm, and that

he was treated by a physician in the employ of defendant corporation until the fracture was finally healed; that he returned to work on April 19, 1932, doing the same work that he had been doing prior to his injury and continued so to work until August 3, 1932, when he resigned from the employ of the company. Defendants further pleaded that plaintiff was familiar with the work that he was required to perform and of his physical condition, and that in carrying out the employment he had assumed the risk incident thereto.

The new matter in defendants' answer was denied by reply.

At the close of plaintiff's testimony, defendants moved for an involuntary nonsuit. At the close of all the testimony in the case, defendants moved the court to direct a verdict in their favor on the ground that no actionable negligence had been shown. The court overruled both motions and the jury returned a verdict in favor of plaintiff, and judgment was entered thereon against both defendants.

Thereafter defendants moved for a new trial on the usual statutory grounds: Excessive damages, insufficiency of the evidence, and errors of law occurring at the trial duly excepted to.

The court set aside the judgment and verdict and granted a new trial on the grounds that the plaintiff failed to show actionable negligence because the law, as modified by the Employers' Liability Act of 1910, was inapplicable to the facts proven. Plaintiff appeals, assigning as error the said action of the trial court.

The real questions presented by the record are: (1) Was it actionable negligence on the part of the employer, with knowledge of plaintiff's weakened physical

condition and that he had been promised light work, to insist that plaintiff perform the work assigned to him by the foreman, or quit? (2) Did the plaintiff, having the same knowledge, assume the risk incident thereto?

The general use of power-driven machinery revolutionized the manufacturing industry as well as nearly all other lines of business. The extensive transactions and mass production under corporate control and management render the relationship of master and servant complex and complicated. The inventive genius of man has been more prolific in the production of power-driven, labor-saving machinery and appliances, in the past half century, than in all the centuries of recorded history going before. Nearly all trade, commerce and industry are carried on by agents or factors representing the stockholders of the corporation conducting any particular commercial enterprise.

The common law, as it existed at the time of the adoption of our constitution, no longer sufficed as a just standard of rules and regulations to govern the rights, duties and responsibilities under the changed conditions between employer and employee. It was found necessary to provide by statute a new and different standard of duty on the part of the master to safeguard the life and limb of the employee.

At common law, it was the duty of the master "to provide his servants a reasonably safe place to work in, reasonably safe tools and appliances with which to work, and to exercise reasonable care and diligence to keep them in this condition.": *Duntley v. Inman,* 42 Or. 334 (70 P. 529, 59 L. R. A. 785); *Kopacin v. Crown-Willamette, etc.,* 62 Or. 291 (125 P. 281). It was also the master's duty to exercise reasonable care in the

selection of competent servants: *Olsen v. Silverton Lumber Company,* 67 Or. 167 (135 P. 752); *Adskim v. Oregon-Washington R. & N. Company,* 129 Or. 169 (276 P. 1094).

In order to relieve the harshness of the common law in relation to the duty the master owed the servant, the people of the state of Oregon, in 1910, through the initiative, enacted a statute usually referred to as the Oregon Employers' Liability Act. Up until that time the duty owed by the master to the servant was governed by the common law. The statute (§ 49-1701, et seq., Oregon Code 1930) so enacted provides, in its first part, that all corporations, or persons whatsoever (employers) engaged in a work involving a risk or danger to an employee shall see that the workman is accorded a safe place to work in, and safe tools to work with; that all materials used in the work shall be inspected to detect any defects therein, and in certain specific instances of employments, involving a risk or danger, what shall be done by the employer to safeguard the life and limb of the employee; and that all dangerous machinery shall be securely covered and protected to the fullest extent that the proper operation of the machinery permits.

The last clause of the section, usually referred to as the "and generally" clause, provides:

"* * * and generally, all owners, contractors or subcontractors and other persons having charge of, or responsible for, any work involving a risk or danger to the employees or the public, shall use *every device, care and precaution* which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or

safety appliance and devices." Oregon Code 1930, § 49-1701. [Italics ours.]

In *Lang v. Camden Iron Works,* 77 Or. 137 (146 P. 964), Mr. Justice McBride, in discussing the title of the act said:

"The words 'about any machinery or in any dangerous occupation, and extending and defining the liability of employers in any and all acts of negligence, or for injury or death of their employees,' here employed, are sufficiently broad to include nearly any conceivable case of negligence; and while the text of the act is perhaps more narrow than the title, it is still broad enough to include most of the injuries suffered by employees where any risk or hazard would seem naturally incident to the employment."

Respondents contend that the "and generally" clause is only intended to apply to the tools, appliances and materials with which the work is done and the place where the employee works. However, that part of the law that abrogates the defense of the negligence of a fellow servant and the contributory negligence of an injured employee (§ 49-1705, Oregon Code 1930) would seem to indicate that something more than safe tools and a safe place to work was implied in "every device, care and precaution".

In *Lang v. Camden Iron Works,* supra, the learned justice enumerates the particular acts of omission which constitute negligence under the act, as follows:

"* * * (g) failure to use every practicable *device* for protection of life and limb in all dangerous employments; (h) failure to use every practicable *care and precaution* for the safety of life and limb." [Italics ours.]

It thus appears certain that the court did not consider that the words "care" and "precaution" were

limited to devices, tools and the other specifically enumerated particulars in the first part of the section of the act, but also to an added duty on the part of the employer, because it goes on to say:

"The words 'every device, care, and precaution', used in the act, must be taken in their full sense, except as limited by the context, and this limitation must be construed merely as qualifying the word 'device'. The words 'care and precaution' apply not only to the safe condition of the machinery, considered merely as such, but to the method of its operation, and, if a machine safe in itself becomes a source of injury by reason of the fact that the employer or those representing him fail to use reasonable care in its operation, and thereby an injury is inflicted upon an employee not in control of its operation or management, the injury is within both the letter of the act and the mischief which it was designed to remedy."

The act modifies the common law relating to the duties of the master towards the servant, to a very considerable extent. The intention of the drafters of the bill, and of the people in enacting it into law, was to provide for the better protection of the life, limb, and general health of the employees, than had been theretofore afforded under the common law.

Under the above act, the defense of the negligence of a fellow servant, in actions to recover damages from the employer "for injuries suffered by the employees", to a large extent is abrogated: § 49-1705, Oregon Code 1930. It also bars the contributory negligence of the injured employee as a defense, but provides that such negligence may be taken into consideration in fixing the damages: Id. § 49-1706. The act requires safeguards to be provided by the employer for "the protection of the safety of the life and limb" of the employee, from injury by reason of the operation of the plant, limited

only to the efficiency of the structure, machine or device without regard to the additional cost of material or safety device. In certain specified instances, the incompetency or negligence of the person in charge of the work, the incompetence or negligence of any person to whose orders the employee was bound to conform, and did conform, and by reason of his having conformed thereto, the injury or death resulted, is no defense in an action for damages by an injured employee, or, in case of his death, by his representatives. This would indicate that the employee does not assume the risk incident to his obedience to orders.

Plaintiff was ordered to do this particular work by his foreman. The foreman, having knowledge of plaintiff's weakened physical condition, did not use every "care and precaution" to prevent injury to plaintiff.

It will be seen that the law was intended to guard the employee against not only sudden accidental injuries but also against insidious, continuing injury. We do not think it requires a broad stretch of the doctrine of liberal construction to include all injury resulting from the negligence of the employer.

It is impracticable, if not impossible, to legislate so as to cover every detail of human activity that may arise in connection with any given subject. The statute now under consideration imposes certain specific duties on the master in relation to work involving risk and danger and then provides certain general requirements. It is the duty of the court in interpreting a statute to so construe it as to carry out the intent of the legislature or the people, in conformity with the generally accepted standards of right and justice as are common to people who use ordinary care, prudence and foresight in their social and business intercourse. To

use every "device, care and precaution" requires the master not only to discharge the duties specifically enumerated and enjoined by statute but also to discharge those which he voluntarily assumes.

During the month of January, 1932, while in the employ of the defendant Southern Pacific Company, the plaintiff suffered a fracture of his arm, and the defendant, Southern Pacific Company, employed a physician to treat the injury. Plaintiff produced testimony tending to show that after being under his care for approximately three months, said physician advised him that he could return to his employment and perform light work. He was requested to report to the claim agent who also advised him to report at the shops for light work. The claim agent thereupon, in the presence of plaintiff, phoned the defendant Kubler and told him to give plaintiff light work. On reporting at the shops for duty, the foreman, defendant Kubler, put him to work at the same job on which he had been employed prior to his injury. Plaintiff complained that the work was too hard, and the foreman told him that he could do that or quit.

The plaintiff, who is a foreigner, and who speaks English with difficulty, testified:

"A. Well, he told me that he,—'you can go to work.' And I says 'what kind of job you give me?' He says: 'The same job, boiler maker helper.' And I says, I says: 'I can't take that job because my arm is so sore, a little sore yet on account of my muscle; it is kind of tender yet.' Q. You mean your muscles were weak? A. Yes, weak. And I says: 'I can't go on that buck-up.' He said: 'You take that job because I don't have nothing else.' * * *

"A. I said: 'My arm is awful bad, it is awful bad, and the pain and I believe the arm is going out of place again;' and then he says, I says: 'This job is too hard

for me, the job is too hard for me, it is too hard and I like to have a light job;' and he says: 'You stay on that job or quit.' He told me, Mr. Kubler told me that himself, the general foreman of the Southern Pacific told me: 'You stay on that job or quit.'

*     *     *     *     * .

"A. I worked for about another week then I go down again, like I say now, I go down to see the general foreman and I told him my arm is pretty bad, I can't stand it any longer and I would like to have a little lighter work than this. He says: 'I been telling you the other day, as long as I am general foreman you stay on that job or quit', just like this (indicating).''

Plaintiff did not wish to leave the employ of defendant corporation. He had been in its service as a boilermaker's helper for five years. He had earned certain seniority rights, and naturally did not wish to sacrifice these advantages nor did he know that he could obtain employment elsewhere. So he went to work. On several occasions thereafter, he complained that the work was too hard but was always met by the same answer. He kept on with his work until his arm became so injured that he was compelled to quit.

It will be observed that the plaintiff did not testify that the job as a boilermaker's helper was the only job available, but that the foreman said that it was the only job available. The defendant corporation had paid him full pay during the two months in which he was wholly incapacitated, without requiring any service whatever, and naturally plaintiff believed that it would provide him light work, as he had been promised, at which he could earn the amount that was being paid.

Regardless of the direct authority conferred upon the claim agent, he assumed authority to act for the

corporation, and the defendant corporation took the benefit of his work in accepting a release from all damages growing out of the previous injury on the payment of the wages during plaintiff's time off, and the further promise that he should receive light work until his arm was fully recovered.

It is contended by respondents that the plaintiff based his cause of action and elected to do so, solely on the Employers' Liability Act. This view was also taken by the trial court who granted a new trial upon the ground that the alleged cause of action did not come within the act. In *Lang v. Camden Iron Works,* supra, in disposing of a contention that the pleading did not definitely show that it was the intention of the plaintiff to bring his action upon the statute, Mr. Justice McBride stated:

"It is contended that the pleading does not definitely show that it was the intent of the plaintiff to bring his action upon the statute. The complaint is somewhat loosely drawn, but it shows a state of facts which indicates that the work in which plaintiff was engaged was hazardous; (then are enumerated the particular acts of negligence) * * *. Where these matters appear it is not necessary for a plaintiff to expressly declare upon the statute, and this is especially true where the defendant does not demur to the complaint or move to make it more definite and certain, as is the case here: * * *".

It is not the province of counsel, but the duty of the court, to draw the legal conclusions which are applicable to the facts alleged in the pleadings.

The type of work in which plaintiff was engaged at the time of the alleged instant injury was a work involving a "risk or danger". It was carried on by means of power-driven machinery; a heavy power-

driven riveting machine and a heavy power-driven reamer, weighing from fifty to seventy-five pounds which the operator had to hold and support in his hands.

"A. Then we have another job to put,—he take old staybolt,—we have to put new one, radial stay.

\* \* \* \* \*

"Q. What kind of work do you do in connection with that?

"A. Well, that is when,—that meant to,—we have to reamer when we take old stay bolt we have to ream the hole with corner motor.

"Q. What did that corner motor weigh?

"A. From fifty to seventy-five pounds.

"Q. And in that corner motor,—what did you do?

"A. Well the, we have to—radial stay is up over above the head, see (indicating); we have to hold that corner motor way up there, see (indicating) and stay bolt is pulled kind of flat and the radial stay is above the head, way on top of engine and I have to hold that motor up there (indicating) corner motor up here.

\* \* \* \* \*

"Q. Now when you hold that up there what is done with it?

"A. Well, I have to push it hard to cut that iron.

"Q. Does it run itself?

"A. No, the air; the boilermaker he turn the air and I hold the motor.

"Q. Where is the boilermaker, where was he?

"A. He is right there; he have that thing to turn on the hose and I hold that motor and the reamer."

Thomas H. Ray, with over twenty years experience as a boilermaker, and at the time of the trial, secretary of the Boilermakers' Union, fully corroborated plaintiff's testimony as to the risk and danger involved. This witness further testified in response to a question

as to the manner in which the corner motor was operated, as follows:

"A. In the manner like that (illustrating); there isn't two men can hold the motor, it pulls so hard that you have pretty near got to have some support or brace that the handle lays up against, and the pull is so hard that you can't hold it; you have got to keep jerking it until it reams that hole and the man underneath, he has got the worst end of the motor; the man on the throttle has the easy end; if his hands are slipping or giving way he can shut the motor off, where a helper, he is stationed on the side, he has got to hang on to it and hold it straight.

"Q. What do you take hold of?

"A. You take hold anyplace, hook it all the way around if you can. Men have got tangled up and hooked up on it, they have had no control over it but by clinching the hose that would stop the air, that would leave it free and loose, that there was no pressure against it."

He further testified:

"A. I wouldn't handle one of them things steady, myself, at no time. It is the hardest work of any machine that is made for a helper to get on; it is the hardest machine to handle.

"Q. Well now, what about this bucking up; is that hard work?

"A. Well, it is so hard that there is over,—I represent over four hundred men and out of the four hundred men I only got twenty-five men that will do that class of work; they don't want it because it is too hard, and it pays a little more money than what the other average general helper gets.

"Q. And boilermaker helpers, is that easy or hard work?

"A. Well, there is some—there is different classes.

"Q. Take it over there in this shop that they have got a man doing the work around those engines as a

bucker-up and also handling this instrument right here (indicating)?

"A.  He has got the hardest work in the shop of the helper handling the motor and the holding bars.  Bucking up rivets is the hardest work that can be done for a helper in a shop."

We have carefully examined all the authorities called to our attention involving the right of recovery of an employee injured in the course of his employment by the negligence of the master and found none exactly in point.

While we feel that the Employers' Liability Act applies in this action, even if it should not, it cannot be held that plaintiff assumed the risk.

In *Bevin v. O.-W. R. & N. Company*, 136 Or. 18 (298 P. 294), an action under the Federal Employers' Liability Act which does not abolish the doctrine of assumption of the risk, this court held that where the master promises to replace and repair a defective tool and insists the employee either continue working with such defective tool or quit his job, the master thereby relieves the employee of the assumption of the risk notwithstanding that the employee knew of the defect and that it was likely to cause him injury.  The employee had a right to assume that the promise would be carried out within a reasonable time.

" 'A servant acting under the commands or threats of his master does not assume the risk incident to the act commanded unless the danger incurred is full appreciated and is such that no person of ordinary prudence would consent to encounter it; and the mere fact that the servant knows that there is some danger will not defeat his right to recover if in obeying he has acted with ordinary care under the circumstances'."  26 Cyc. 1221; Chesapeake & O. R. Co. v. DeAtley, 241 U. S.

310 (36 S. Ct. 564, 60 L. Ed. 1016); New York, N. H. & H. R. Co. v. Vizvari, 210 Fed. 118.'' Cited with approval in *Martinson v. C. B. & Q. R. Co.,* 102 Neb. 238 (166 N. W. 624).

To say that the ''incompetence or negligence of any person to whose orders the employee is bound to conform'' and by reason of such obedience to orders, the employee is injured, is no defense to an action for such injury, and then hold that the employee by obeying the orders assumes the risk of such negligence or incompetence is ''to keep the promise to the ear and break it to the heart''.

In *New York, N. H. & R. Company v. Vizvari,* 210 Fed. 118, there is a very interesting discussion of the growth of the law relating to the duties owed by the master to the servant, as well as the nature of the contract between them. While the action arose out of the use of a defective tool, the principles announced therein are analogous to those which should obtain in the instant case. The action therein arose out of an injury received by the use of defective tool, which the servant knew to be defective and that if he continued to use it he was liable to be injured, and protested to his foreman against its continued use, but was told he must continue the work or quit the job. It was contended by the defendant therein that plaintiff had assumed the risk. This contention was answered by the court by saying that it was a question for the jury to determine and not for the court.

A general examination of the authorities would seem to strongly support the doctrine that when there is a dispute or controversy as to what the contract of employment was between the master and the servant, out of which the cause of action arose, it is a question

of fact to be determined by the jury: *N. Y. & N. H. R. R. Company v. Vizvari,* supra; *Fitzwater v. Warren,* 206 N. Y. 355 (99 N. E. 1042, 42 L. R. A. (N. S.) 1299); *Looney v. N. & W. R. Company,* 102 W. Va. 40 (135 S. E. 262, 48 A. L. R. 860); 18 R. C. L. 676. It is not the function of the court to make contracts for the parties litigant, but to announce only what may or may not be implied by law in their contractual relations. Parties have a right to make their own contracts so long as such contracts do not violate the law or public policy. In the instant case, there is evidence to support plaintiff's contention that he was promised light employment should he return to work; that he was informed by the physician who was employed in his behalf by the defendant corporation that he was fit for light work. There is also evidence that, at the time he signed a release to the company for the previous injuries, the claim agent of the company promised him light employment. He had a right to rely on this promise and to assume that before he should sustain any permanent injury it would be carried out.

It is negligence on the part of the master to fail to discharge a duty imposed by law. It is equally negligent to breach an obligation voluntarily assumed. We can see no essential difference in principle between such duties.

In performing his duties, plaintiff was in the class intended to be protected by the statute covering such employment. A negligent order given by a foreman to one who is under obligation to obey it is as much an act of negligence as furnishing an unsafe tool.

The defendant also contends that the injury sustained by plaintiff was not a personal injury, within the meaning of the statute, and that even if he had been

promised light employment his action would be for a breach of contract, and not in tort.

The Merchant Marine Act of 1920, 46 U. S. Code, § 688, commonly known as the Jones Act, provides: "that any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, * * *''. In the case of *Cortes v. Baltimore Insular Line*, 278 U. S. 367 (53 S. Ct. 173, 77 L. Ed. 368), a personal representative of a seaman sought to recover damages by reason of the seaman's death from pneumonia caused by the failure of the master of the ship to give him proper care. It was contended that the injury arose out of contract, and therefore no action could be maintained in tort. The United States supreme court, speaking through Mr. Justice Cardozo, said:

"We think the origin of the duty is consistent with a remedy in tort, since the wrong, if a violation of a contract, is also something more. The duty, as already pointed out, is one annexed by law to a relation, and annexed as an inseparable incident without heed to any expression of the will of the contracting parties. For breach of a duty thus imposed, the remedy upon the contract does not exclude an alternative remedy built upon the tort. * * * So, in the case at hand, the proper subject of inquiry is not the quality of the relation that gives birth to the duty, but the quality of the duty that is born of the relation. * * * If the default of the vessel or its officer has impaired his bodily or mental health, the damage to mind or body is none the less a personal injury because he may be free at his election to plead it in a different count.''

Counsel for respondent cites many cases to the effect that where the servant is assigned work that is beyond his strength he assumes the risk and there

is no liability on the part of the master. This court does not follow that doctrine in its entirety: *Christie v. Great Northern Railway Company,* 142 Or. 321 (20 P. (2d) 377). But, in the instant case, we must remember that the defendants knew of the weakened condition of the plaintiff's arm and that its physician advised plaintiff that complete cure would be sooner corrected by his engaging in light employment which the company would furnish him on his return to work. Defendant corporation was not engaging an employee who possessed a knowledge of his physical condition which was not possessed by defendant corporation and its foreman. They were simply assigning to work one, already in their employ, who, their own physician said, was physically incapable of performing such work.

There is also evidence tending to show that to a certain extent plaintiff was coerced into continuing his employment. It was said in *New York N. H. & H. R. Company v. Vizvari,* supra, that:

"For courts to assume as matter of law that one voluntarily assumes the risks involved in continuing to work with unsafe appliances furnished by the master, rather than lose his employment and subject himself to the consequences which are apt to ensue from the loss of his position, seems to us a harsh and unwise doctrine. It assumes that physical compulsion is the only coercion which a court of justice can recognize. At a time when enlightened states in Europe and America are enacting employers' liability laws and workman's compensation acts to modify established principles of the law which are now thought to be unsuited to existing economic and social conditions, the courts should be careful not to fall into the error of assuming as matter of law what is far more properly matter of fact. The question of negligence is generally a deduction of fact from other facts and not a conclusion of law. It is not a question of law unless the statute or the decisions of the

courts have established a definite rule of conduct for a given situation. Thus if the law of particular jurisdiction establishes the rule that one approaching a railroad track 'must stop, look, and listen', and one in disregard of the rule undertakes to cross the track and is injured, there is nothing to submit to the jury. The question must go to the jury where the facts are in dispute or where fair minds might draw different conclusions from the facts as disclosed by the evidence. Thompson on Negligence, §§ 429, 430. And so in reference to assumption of risks, where an employe has knowledge of a defect or danger and calls, as in this case, the attention of the employer or his representative to it, and is ordered to go on with the work, the question should go to the jury to say whether the danger was so manifest that a person of ordinary prudence and caution would have incurred it and also whether the risk was imminent.''

The court must take judicial notice of the economic and financial depression. At the time of the injury complained of, there were ten millions to fifteen millions of people out of employment—many either on private charity or government relief for food and sustenance. A reasonable, careful, prudent person would hesitate to quit his work where there was a possible chance to recover his strength or to be furnished such employment as he was promised and physically able to do. Under conditions as they existed during the depression, to tell a self-respecting laboring man, ''You can do this work, or quit'', is equivalent to telling him he can accept the employment offered or go hungry.

It is intimated that the amount of the verdict is excessive, and, for that reason, we should scrutinize the errors complained of more carefully than if the verdict for the plaintiff was not so large. It was the habit of a few judges, in substituting their judgment for that of

the jury, that brought about the amendment of our constitution which deprives the judges of that power.

"In actions at law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise reexamined in any court of this state, unless the court shall affirmatively say there is no evidence to support the verdict." Constitution of Oregon, Article 7, § 3.

Defendants present a further question in their contention that in no event can the judgment be sustained against defendant Kubler. This court seems to be committed to the doctrine that, under the law relating to master and servant as enacted in the Employers' Liability Act in an action by the servant against the master and a co-employee, there can be no recovery against the co-employee in such an action: *Gray v. Hammond Lumber Company,* 113 Or. 570 (232 P. 367, 233 P. 561, 234 P. 261), and the cases cited therein. It was error for the court not to have directed a verdict as to defendant Kubler.

I dissent.

BEAN and KELLY, JJ., concur in this dissent.